**NOT RECOMMENDED FOR PUBLICATION**
File Name: 15a0485n.06

**No. 14-4026**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 07, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| VICTORIA JOHNSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| | ) | |
| UNIVERSITY HOSPITALS PHYSICIAN SERVICES, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: SUTTON, GRIFFIN, and WHITE, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Victoria Johnson alleges that her former employer, defendant University Hospitals Physician Services, discriminated against her based on a perceived disability and retaliated against her for alleging such discrimination. But Johnson presented insufficient evidence to establish either. We therefore affirm.

I.

As a provider enrollment specialist, Johnson was tasked with enrolling doctors in Centers for Medicare and Medicaid ("CMS") programs using application form 855I, which she forwarded to contractor Cigna Government Services for processing after the forms were completed. Section 2B of the form requires applicants to provide their contact information. CMS manual provides that the contractor (Cigna) shall call the telephone number provided in

section 2B to "verify that the contractor can directly contact the applicant. If an answering service appears and the contractor can identify it as the applicant's personal service, it is not necessary to talk directly to the applicant or an official thereof. The contractor only needs to verify that the applicant can be reached at this number."

Defendant's supervisors instructed Johnson to use her work phone number in section 2B instead of a doctor's direct line or answering service. At one point, defendant's management also instructed staff to answer the phones differently if it appeared that Cigna was calling, to give the impression that the office—a department with multiple functions including billing services for the hospital system at large—was not a "billing agency." From approximately October 2011 to June 2012, Johnson put her phone number in section 2B without raising concerns. In June, some of the forms were returned. Once she reprocessed them—again using her phone number—they were approved. Nonetheless, Johnson began to express concerns to her supervisors about using her phone number. She asserts that she was worried about violating the law because she believes there are criminal penalties for providing false information on the form.

In July 2012, Johnson called defendant's compliance hotline with her concerns. Carole Meisler, one of defendant's compliance officers, investigated the complaint. On July 17, Meisler called Johnson about the complaint. The same day, Meisler emailed Johnson, advising that she spoke with Cigna representatives who explained that they do not expect to have direct access to doctors because doctors are busy taking care of patients; they merely need a phone number to contact someone who will get the information from the doctor and report back. Accordingly, Meisler advised Johnson that the practice of using Johnson's phone number complied with CMS protocol.

Questioning Meisler's advice, Johnson exchanged multiple emails with Cigna representatives to clarify their expectations. Johnson states the representatives told her the contact information "cannot be that of the billing office." On July 20, Johnson advised her supervisors that she would no longer use her phone number on the form. On July 23, defendant's chief compliance officer, Cheryl Wahl, wrote a letter to Johnson, advising her that Meisler had contacted Cigna and confirmed that using an enrollment specialist's phone number in section 2B was "both allowable and correct."

The following day, Johnson forwarded to her supervisors an email she received from a Cigna representative, again challenging defendant's practice. Meisler again contacted Johnson and explained that she had talked to the supervisor of the Cigna representative with whom Johnson had spoken. According to Meisler, the Cigna supervisor clarified that when Cigna called, it would be sufficient for Johnson to state that, "the provider will not pick up the telephone but as a part of [my] job description, [I will] get any message to him/her, [and] that [I] will contact the provider for [Cigna] as a part of [my] job." Johnson questions whether Meisler ever contacted Cigna, but the parties do not dispute that the office openly continues this practice to this day.

Meanwhile, Johnson's supervisors confronted another problem. Months before Johnson expressed concerns about section 2B, she received a relatively poor annual performance review, which mentioned that she "nodd[ed] off" during a staff meeting. Johnson also occasionally napped at her desk during her breaks. In April 2012, apparently after some conflict with coworkers, Johnson's supervisor asked her to put up a sign indicating she was on a break when she slept at her desk. In an email response, Johnson explained that she was napping at her desk (instead of a break room) in "the best interest of the company" and asked her supervisor to tell

her coworkers not to disturb her. In June, Johnson informed the same supervisor that she would be late for work on one day because a new medication made her drowsy. On July 6, a coworker observed Johnson napping at her desk under a blanket for over fifteen minutes—so long and in such a position that the coworker felt compelled to gently wake Johnson to ask if she was okay. Similarly, on July 17, a human resources employee observed Johnson sleeping at her desk and woke her to see if she was all right. At that time, there was no written company policy about napping.

On July 26, Johnson met with two supervisors and a human resources employee. Johnson shared that she had been taking medication that made her sleepy and that the situation "was out of [her] control." They informed her that, due to the sleeping at work, they were referring her to an employee assistance program for a fitness-for-duty evaluation for "impaired functioning." Johnson contacted her own doctor and submitted a form to take a short-term disability leave or leave under the Family and Medical Leave Act ("FMLA"). Shortly thereafter, Johnson underwent the evaluation. The resulting report indicated that Johnson was referred for "falling asleep at work," and "[i]n general . . . a difficult relationship with her manager." Ultimately, the report concluded that Johnson did not have a functional impairment but recommended that she take two weeks off work and see a psychiatrist, who should sign off on her readiness to work. Johnson was referred to a psychiatrist who approved her return to work beginning September 4. Johnson asserts that she was ready to return to work then. On August 21, human resources became aware Johnson was no longer under the care of the same psychiatrist and informed Johnson that she was required to provide a new medical certification. Johnson did not produce new documentation, but did not return to work either. She later stated that she had been waiting for return-to-work paperwork from the employee assistance program.

On October 1, human resources wrote Johnson advising her that her leave ended on August 21 and she was expected to return to work by October 8 or her employment would be terminated. Around that time, Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that defendant had discriminated against her on the basis of a perceived disability.[1] When Johnson received the October 1 human resources letter, she responded with a six-point list of expectations for her return, including that she would not use her phone number on form 855I.

Johnson returned to work on October 8, 2012. In a meeting with supervisors, she refused to comply with their instructions that she use her phone number on form 855I. They offered her twenty-four hours to reconsider, but Johnson insisted that she did not need the time because she would not complete the form as instructed. Defendant terminated Johnson for refusal to perform an essential job function. Johnson initiated this lawsuit in state court, but defendant removed it to federal district court. The district court granted summary judgment in favor of defendant on all counts. Johnson now appeals.

II.

We review de novo a district court's grant of summary judgment. *Havensure, L.L.C. v. Prudential Ins. Co. of Am.*, 595 F.3d 312, 315 (6th Cir. 2010). Summary judgment is proper if the evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We consider all facts and inferences drawn therefrom in the light most favorable to the nonmovant." *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001).

---

[1]Defendant does not dispute that it was aware of the EEOC charge by the October 8, 2012, meeting between Johnson and her supervisors.

Johnson presents two claims: discrimination on the basis of a perceived disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112(a), and Ohio Revised Code § 4112.02(A); and retaliation for filing a charge of discrimination, in violation of the ADA, 42 U.S.C. § 12203(a), and Ohio Revised Code § 4112.02(I). Neither cause of action implicates protection for whistleblower activity.

A.

We first consider whether Johnson has established a prima facie case of disability discrimination based on two of defendant's actions—requiring a fitness-for-duty evaluation and purportedly delaying Johnson's return to work. Johnson does not argue on appeal that she was terminated because of a perceived disability. Johnson has failed to satisfy her prima facie burden because she has not shown that defendant regarded her as disabled or took adverse action because of a perceived disability.

The ADA provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Similarly, Ohio state law prohibits "any employer, because of the . . . disability . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Revised Code § 4112.02(A).[2]

---

[2]We analyze the ADA and Ohio state-law claims together because, in disability discrimination cases, Ohio courts look to federal regulations and cases interpreting the ADA for guidance in interpreting Ohio law. *See, e.g.*, *Knapp v. City of Columbus*, 192 F. App'x 323, 328

To determine whether circumstantial evidence supports Johnson's claim, we use the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802−06 (1973). Under that framework as pertinent here, Johnson establishes a prima facie case by showing that (1) defendant regarded her as disabled,[3] (2) she is otherwise qualified for the job, with or without reasonable accommodation, and (3) she suffered an adverse action because of her disability. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014). The alleged discrimination must have been a "but-for" cause of the employer's adverse employment action. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2011) (en banc). Once Johnson presents a prima facie case of discrimination, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for its actions. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 813 (6th Cir. 1999). If defendant does so, the burden shifts back to Johnson to show that the proffered reason is pretext for unlawful discrimination. *Id.*

"[A] person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521−22 (1999).

> [W]hen the major life activity at issue is working, the statutory phrase "substantially limits" takes on a special meaning . . . and imposes a stringent standard, requiring proof that the employer regarded the employee as significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training,

---

(6th Cir. 2006); *Spencer v. Nat'l City Bank*, 732 F. Supp. 2d 778, 787 (S.D. Ohio 2010); *see also City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206−07 (Ohio 1998).

[3]Included in the ADA's definition of a disabled person is someone who does not have an impairment that affects a major life activity but is "regarded as" having one by her employer. 42 U.S.C. § 12102(1)(C), 12102(3); *Sullivan*, 197 F.3d at 810.

skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 704 (6th Cir. 2008) (internal quotation marks omitted).

Johnson's sole evidence that defendant perceived her as disabled is that it referred her to a fitness-for-duty evaluation. "[A] defendant employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled." *Sullivan*, 197 F.3d at 810. An employer's request that an employee undergo a medical exam "may signal that an employee's job performance is suffering, but that cannot itself prove a perception of a disability because it [alone] does not prove that the employer perceives the employee to have an impairment that substantially limits one or more of the employee's major life activities." *Id.* at 811. "Deteriorating [employee] performance may be linked to motivation or other reasons unrelated to disability." *Id.*

Defendant stated on the referral form that "impaired functioning" was the basis for Johnson's referral. The report of the doctor who examined Johnson stated that she was referred for evaluation because she was "falling asleep at work," and generally had a "difficult" relationship with her manager. These reasons for referral are directly related to Johnson's ability to do her job. Johnson focuses the bulk of her argument on the possibility that she was "punitively" referred for evaluation because she disagreed with her supervisors over how to fill out form 855I. But even if we assume Johnson was referred for irritating her supervisors,

Johnson has failed to establish a question of fact over whether her supervisors perceived her as disabled.[4]

Johnson also alleges defendant contravened the ADA by delaying her return to work. The district court held that Johnson failed to establish that the duration of her leave was "because of" a perceived disability. Moreover, the district court concluded that there was no evidence that defendant's reason for failing to return her to work was pretext. Defendant argues that it went to lengths to honor Johnson's doctor's medical recommendations and, despite Johnson's failure to submit FMLA paperwork in support of her leave or return to work, it invited her back to work. Thus, defendant maintains that it did not take any action to *prevent* Johnson from returning to work. The record supports the district court's conclusion that, even taking all inferences in Johnson's favor, there was a miscommunication between the parties about when Johnson would return to work, but not a delay to reinstate based on a perceived disability. Johnson's six-point demand letter suggests that Johnson did not urgently desire to return to work, unless her demands were met. And even if Johnson could show that defendant "delayed" her return to work because of her interpretation of form 855I, it would still not establish that her leave was extended because defendant perceived her as disabled. Johnson's disability discrimination claim fails as a matter of law.

---

[4]Johnson's brief suggests that she alleged a separate claim under 42 U.S.C. § 12112(d) for violation of the ADA based solely on the fitness-for-duty evaluation, as opposed to 42 U.S.C. § 12112(a), which requires her to show that her employer perceived her as disabled, *see Demyanovich*, 747 F.3d at 433. But Johnson did not allege such a claim. R. 9, ID 72 (alleging discrimination on the basis of a perceived disability). Therefore, her claim is properly analyzed as a § 12112(a) claim.

B.

Johnson's final claim is that she was terminated in retaliation for filing an EEOC discrimination charge. This claim fails for lack of pretext. The ADA prohibits employers from discriminating against a person because she "has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). Ohio state law similarly prohibits "discriminat[ing] in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge [of discrimination]." Ohio Rev. Code § 4112.02(I).

To establish a disability-retaliation claim, Johnson must first make out a prima facie case, showing "(1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action." *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007). If Johnson establishes a prima facie case, the burden shifts to defendant to produce evidence of a legitimate, nondiscriminatory reason for termination. *Id.* at 570. If defendant satisfies that burden, Johnson must demonstrate the proffered reason is pretextual. *Id.* Johnson may show pretext by "offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805−06 (6th Cir. 1998).

We assume for purposes of argument that Johnson has established a prima facie case. Therefore, Johnson has the burden of showing that defendant's proffered reason for termination—her refusal to perform an essential job function—was pretext for disability retaliation. However, Johnson has not demonstrated that her refusal to complete form 855I as

instructed did not motivate defendant to terminate her, or that it was insufficient, or had no basis in fact. On this record, there is no evidence to reasonably infer that if Johnson had followed her employer's directions she would have been terminated anyway. On the contrary, Johnson acknowledged that she would probably still be working for defendant if she had followed its instructions. Nor does temporal proximity, standing alone, satisfy Johnson's burden of showing pretext. *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012) ("'[T]emporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual.'") (quoting *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001)). Johnson's disability-retaliation claim therefore fails as a matter of law.

Johnson expends much effort arguing that defendant has not produced admissible evidence that it contacted Cigna to investigate whether defendant's practices were CMS-compliant. But whether defendant conducted an investigation, or whether its practices were CMS-compliant, is not at issue in this case. This action regards whether defendant discriminated against Johnson because of a perceived disability or terminated her for claiming such discrimination, not whether she was wrongly terminated for whistleblower-protected activity. We need not address Johnson's admissibility arguments to resolve this appeal.

Finally, because we conclude that Johnson has not satisfied her burden of establishing pretext, we do not reach defendant's alternative argument under the "honest belief" rule.

III.

For these reasons, we affirm the judgment of the district court.