RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0275p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

PAULA E. BABB,

*Plaintiff-Appellant*,

*v.*

MARYVILLE ANESTHESIOLOGISTS P.C.,

*Defendant-Appellee*.

No. 19-5148

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:17-cv-00242—Thomas W. Phillips, District Judge.

Decided and Filed:  November 6, 2019

Before:  MOORE, McKEAGUE, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  James H. Price, W. Allen McDonald, Michael R. Franz, LACY PRICE & WAGNER, P.C., Knoxville, Tennessee, for Appellant.  Howard B. Jackson, WIMBERLY LAWSON WRIGHT DAVES & JONES, PLLC, Knoxville, Tennessee, for Appellee.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge.  Under the Americans with Disabilities Act, your employer can't fire you because they *think* you are disabled, even if, in fact, you are *not* disabled.  But Paula Babb contends that her former employer—Maryville Anesthesiologists, P.C.—did just that, *i.e.*, it fired her because it *thought* she was visually disabled, even though, in reality, she is *not* visually disabled.  Maryville Anesthesiologists wholeheartedly disagrees, and

asserts that it fired Babb, not because of any visual disability (whether real or not), but, rather, because Babb committed two "clinical errors" that placed her patients at grave risk of injury. Thus, the central question in this litigation is a familiar one in employment discrimination law: why, exactly, did Maryville Anesthesiologists fire Paula Babb? The district court agreed with Maryville's narrative, and accordingly granted it summary judgment. But, because we think the district court overlooked too many genuine factual disputes in reaching that conclusion, and also improperly excluded expert testimony favorable to Babb along the way, we **REVERSE** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND

This case arrives to us on summary judgment, and so we consider the facts in the light most favorable to Babb, drawing all reasonable inferences in her favor. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016).

Paula Babb is a Certified Registered Nurse Anesthetist ("CRNA") who has practiced anesthesiology for over a decade. R.24-12 (Babb Resume) (Page ID #714–17). In June 2015, Babb began working as a CRNA at Maryville Anesthesiologists, P.C. ("Maryville"), a small practice group that does the bulk of its work at a local hospital called Blount Memorial. R.24-1 (Babb Dep. at 42) (Page ID #288); R.15-11 (Robertson Dec. ¶ 3) (Page ID #161).

Babb's tenure at Maryville began uneventfully, with Babb's supervisors reporting no problems with her work. However, approximately a month into her employment, one of Maryville's physician-owners, Dr. Cheryl Coleman, observed Babb "placing her face very close to a computer screen," and asked Babb why she was doing that. R.15-4 (Coleman Aff. ¶ 3) (Page ID #153). Babb informed Dr. Coleman that she suffered from a "degenerative retinal condition" that made it hard for her to read certain screens and medical records. R.24-1 (Babb Dep. at 41–42) (Page ID #287–88); R.24-3 (Babb Dec. ¶¶ 10–11) (Page ID #551–52). But, Babb reassured Dr. Coleman, this disorder did not affect her ability to do her job. R.24-1 (Babb Dep. at 41–42) (Page ID #287–88).

Dr. Coleman relayed this fact to Dr. Candace Robertson, the Maryville physician-owner responsible for personnel decisions, and added that, as she understood it, Babb "would be blind in ten years." R.24-2 (Robertson Dep. at 105–07) (Page ID #491–93). For her part, Babb denies telling Dr. Coleman that she "would be blind in ten years," and further attests that, in any event, that assertion is "not true." R.24-3 (Babb Dec. ¶ 11) (Page ID #552). Rather, in Babb's view, her condition merely means that she needs to hold written records "close to [her] eyes" to be able to read them; it does not inhibit her ability to read medical records as a matter of course, or impact her ability to perform anesthesiology. *Id*. ¶¶ 10–11 (Page ID #551–52).

In any event, not long after Dr. Robertson received this initial report from Dr. Coleman, two other Maryville physician-owners, Dr. Daniela Apostoaei and Dr. Gaelan Luhn, e-mailed Dr. Robertson with similar concerns regarding Babb's vision. R.15-11 (Robertson Aff. ¶¶ 5–6) (Page ID #161). Admittedly, the e-mails do not make clear the seriousness of Babb's vision issues—for instance, Dr. Luhn's e-mail acknowledges that he wasn't sure if Babb failed to read a certain medical record because of her eyesight or because of poor handwriting—but, nonetheless, following this series of reports Dr. Robertson decided to hold a meeting with Babb to discuss her vision. *Id*. ¶ 7 (Page ID #161, 166).

At this meeting, which occurred on October 30, 2015, Babb "tearful[ly]" explained to Dr. Robertson and Dr. Wilma Proffitt (another Maryville physician-owner) that, approximately ten years prior, an ophthalmologist in Chattanooga had diagnosed her with a degenerative eye condition. *Id*., Ex. 3 (Page ID #166). But, again, Babb insisted that the disorder did not affect her ability to do her job, and that her vision was otherwise "stable." *Id*.; *accord* R.24-1 (Babb Dep. at 53–62) (Page ID #299–308). In response, Drs. Robertson and Proffitt first reassured Babb that, vision issues notwithstanding, she was a "good fit" and was "doing well." R.24-1 (Babb Dep. at 58, 62) (Page ID #304, 308). Then, the two physicians asked Babb to schedule an appointment with her ophthalmologist and report back, which Babb agreed to do. R.15-11 (Robertson Aff. ¶ 7, Ex. 3) (Page ID #166). Dr. Robertson, in turn, asked Babb if she had "disability insurance" (Babb did) because, in Dr. Robertson's words, she thought Babb "might have a disability." R.24-2 (Robertson Dep. at 71) (Page ID #457). And, finally, after the meeting's conclusion, Dr. Robertson e-mailed her fellow physician-owners to tell them that,

because they "all kn[e]w that" an ophthalmologist couldn't issue an opinion definitively "clearing" Babb to practice anesthesiology (because ophthalmologists generally do not make those kinds of calls), Babb's situation might require them to "talk to [their] attorney." *Id.* at 73–74 (Page ID #459–60); R.15-11 (Robertson Aff. ¶ 7, Ex. 3) (Page ID #166).

The months of November and December did not go much better for Babb. Indeed, in an unfortunate catch-22, it appears that, because Babb occasionally began asking other CRNAs to read hospital monitors for her—pursuant to Drs. Proffitt's and Robertson's instructions, and to ensure that she wasn't misreading any vital data—Babb's "vision problems" appeared even more acute to her colleagues. R.24-3 (Babb Dec. ¶ 12) (Page ID #552). Accordingly, at least one CRNA and one Blount Memorial nurse reported further concerns about Babb's vision to Maryville physician-owners in the weeks following the October 30 meeting. R.24-6 (Aycocke Dep. at 43–45) (Page ID #618–20); R.15-10 (Price Aff. ¶ 7) (Page ID #160); *see also* R.15-13 (Wilson Aff. ¶ 3) (Page ID #177) (describing Babb's "difficulties with her vision" as "common knowledge among the CRNAs"). These concerns, in turn, made their way onto Babb's annual evaluations, which were penned by Maryville physician-owners sometime between December 2015 and January 2016. *See* R.24-11 (Babb Evaluation at 3) (Page ID #713) (stating, among other things, "[I am] worried about her eyesight," and "I see her questionable ability to see reflect on how surgeons and the medical staff lack accepting her"); *see also* R.24-2 (Robertson Dep. at 120–22) (Page ID #506–08) (providing background on the evaluation process).[1]

Notably, however, in late December 2015, while Dr. Proffitt was conversing with a Blount Memorial nurse named Charles Price about Babb's vision problems, Dr. Proffitt learned that Babb had apparently committed an error completely *unrelated* to her vision back in October 2015. R.24-5 (Price Dep. at 43–46) (Page ID #568–71). As Price explained it, Babb had been assisting him during the surgery of an obese patient, but, near the end of the surgery, Babb began to wake the patient up too early, before the patient had been placed on the proper bed. R.15-10 (Price Aff. ¶ 4) (Page ID #160); R.19 (Updated Price Aff.) (Page ID #190). This error

---

[1]For what it's worth, on December 16, 2015, Babb met with her ophthalmologist, thus complying with Maryville's request that she undergo an eye exam. R.24-1 (Babb Dep. at 127–29) (Page ID #373–75). But, for unclear reasons, the record does not indicate what that examination revealed.

purportedly caused the patient nearly to fall off the operating table (also called a "fracture table"). *Id.* On January 2, 2016, Dr. Proffitt relayed Price's "fracture table" story (and Price's vision concerns) to Dr. Robertson, and further requested that Dr. Robertson "include these events in Paula Babb's personnel file." R.15-11 (Robertson Aff. ¶¶ 9–10, Ex.4) (Page ID #161, 167).

And, adding fuel to the fire, just a few days later—on January 5, 2016—Dr. Luhn e-mailed Dr. Robertson to inform her that, prior to a "robotic arm" surgery he conducted earlier that day, one of Babb's patients had an unusually high number of "twitches" (four, to be exact), which suggested that Babb had not sufficiently paralyzed the patient. *Id.* ¶¶ 11–12, Ex. 5 (Page ID #162, 168).[2]

About a week later, on January 13, 2016, Maryville's physician-owners held their regular monthly meeting. R.15-11 (Robertson Aff. ¶ 15, Ex. 7) (Page ID #162, 172). At this meeting, the physician-owners discussed Babb "at length," and touched on both Babb's vision difficulties *and* Babb's "clinical errors," *i.e.*, the "fracture table" incident and the "robotic arm" incident. *Id.* At the end of this discussion, the physician-owners voted to fire Babb. As Maryville tells it, it reached this decision *solely* because Babb's "clinical errors" demonstrated that "she could not provide safe and appropriate patient care." *Id.* Accordingly, when communicating its termination decision to Babb, Maryville focused exclusively on the clinical errors, and made no mention of Babb's vision. *See, e.g.*, R.15-14 (Jan. 19, 2016 Robertson E-mail) (Page ID #178) ("I explained [to Babb] that she had been dismissed for cause because of the concerns we had over the robotic case and the fracture table incident.").

Maryville's decision "blindsided" Babb, as nobody at the practice had criticized her anesthesiology techniques prior to her termination. R.24-1 (Babb Dep. at 79–80) (Page ID #325–26). Indeed, at the October 30 meeting, Drs. Robertson and Proffitt had informed Babb that, vision issues notwithstanding, she was a "good fit" and was "doing well." *Id.* at 58, 62 (Page ID #304, 308). But, as Dr. Robertson emphasized at her deposition, Babb's mistakes during the "fracture table" incident and the "robotic arm" incident were "critical" errors that

---

[2]Although Dr. Luhn's e-mail suggested that he learned of Babb's error third-hand, from a Blount Memorial nurse named Lisa Green, Dr. Luhn later explained to his fellow physician-owners that he witnessed Babb's error firsthand. R.18-1 (Luhn Aff. ¶ 3) (Page ID #186); *accord* R.15-7 (Green Aff. ¶¶ 7–8) (Page ID #156).

evinced "terrible clinical judgment." R.24-2 (Robertson Dep. at 60–61) (Page ID #446–47); *see also id.* at 117 (Page ID #503) (adding that Babb's mistake during the "robotic arm" incident was "something that CRNA students should know [not to do] the first day they're in the robotic room as a student").

Curiously, though, in an e-mail sent by one of Babb's fellow CRNAs (Crystal Aycocke) just hours after Babb's firing, Aycocke stated that Maryville had fired Babb almost entirely for the *other* issue discussed during the January 13 meeting, namely, Babb's "worsening" eyesight. The e-mail, which was sent to all Maryville CRNAs, read as follows:

> As most of you know, [Babb] has been having major issues with her eyesight and as of late, it has seemed to be getting even worse. We have had numerous complaints from [hospital] staff regarding her inability to read the monitor, etc. Over the past several months the group has given her several opportunities to provide documentation from her eye specialist saying that she was safe to practice. [Babb] was unable to provide this documentation.[3] *This*, in addition to a few other issues, *has forced the group to make a very difficult decision*. As of today, she is no longer with our group. Sorry to be the bearer of bad news. This was one of the reasons that our meeting was postponed. See you all tomorrow.
>
> Crystal.

R.15-3 (Aycocke Aff., Ex.1) (Page ID #152) (emphasis added).

It is undisputed that Aycocke wrote this e-mail at Dr. Proffitt's direction, shortly after conversing with Dr. Proffitt (in person) about Maryville's decision to fire Babb. R.24-6 (Aycocke Dep. at 35–37, 62–65) (Page ID #611–13, 638–41). However, both Aycocke and Dr. Robertson insist that, during that conversation, Dr. Proffitt did not tell Aycocke *why* Maryville was firing Babb, and that Aycocke (a first-year CRNA) based the e-mail's content solely on "rumor and innuendo" shared among CRNAs and Blount Memorial staff. R.24-2 (Robertson Dep. at 150–55) (Page ID #536–41); *accord* R.15-3 (Aycocke Aff. ¶¶ 5–11) (Page ID #151).[4]

---

[3]At her deposition, Aycocke testified that she could not recall the factual basis for this assertion. R.24-6 (Aycocke Dep. at 58–59) (Page ID #634–35); *see also supra* n.1.

[4]The record does not contain any testimony from Dr. Proffitt on this subject.

Babb then began working at another local anesthesiology provider. R.24-3 (Babb Dec. ¶ 27) (Page ID #556). There is no evidence that Babb's new employer has called into question Babb's vision, or Babb's clinical judgment. *Id.*

On June 7, 2017, after receiving a "right to sue" letter from the Equal Employment Opportunity Commission, Babb sued Maryville for disability discrimination. More specifically, Babb alleged that Maryville violated the provision of the Americans with Disabilities Act ("ADA") prohibiting discrimination against employees "regarded as" disabled. 42 U.S.C. § 12102(1)(C). In other words, Babb did *not* contend that she *was* disabled, but, rather, that Maryville *thought* she was disabled (because of her vision), and that Maryville acted wrongfully in firing her as a result of that erroneous perception.

Notably, during discovery, Babb supplemented her personal testimony disputing that she did anything wrong during either the "fracture table" incident or the "robotic arm" incident, *see, e.g.*, R.24-3 (Babb Dec. ¶ 16–25) (Page ID #553–55), with an expert report from Jennifer Hultz, an experienced CRNA from the Knoxville area. In Hultz's report (and accompanying declaration), Hultz opined that, even assuming the two incidents happened exactly as Price and Dr. Luhn contended, Babb did not violate the standard of care applicable to CRNAs in the area. R.24-8 (Hultz Expert Rep. at 4–6) (Page ID #669–71). More specifically, Hultz attested (1) that Babb acted appropriately during the fracture table incident because "[i]t is routine practice to begin emerging the patient while still on the operating room table," and because any sudden, unexpected movements in this particular case were almost certainly due to the patient's obesity, *id.* at 5 (Page ID #670), and (2) that Babb acted appropriately during the robotic arm incident because, given the variety of factors at play during such an operation, the presence of "twitches" during surgery does not necessarily indicate that the CRNA did anything wrong, R.24-8 (Hultz Dec. ¶¶ 12–16) (Page ID #662–63).

Maryville then moved for summary judgment. More specifically, Maryville argued that no reasonable juror could find either (1) that Maryville regarded Babb as disabled, or (2) that Maryville's stated reasons for firing Babb, *i.e.*, the two clinical errors, were a pretext to discriminate against Babb on the basis of her eyesight. Maryville also moved, in its reply brief, to exclude Hultz's expert testimony. Although Maryville did not dispute either Hultz's

qualifications or the reliability of her testimony, it nonetheless argued that Hultz's testimony was improper because (1) the facts surrounding the two incidents were "simple" and did not warrant expert explanation, and (2) Hultz intended to tell the jury "what result to reach" with respect to the legal question of pretext. R.26 (Maryville Reply at 5–7) (Page ID #742–44).

On January 16, 2019, the district court granted Maryville summary judgment. *Babb v. Maryville Anesthesiologists, P.C.*, 361 F. Supp. 3d 762 (E.D. Tenn. 2019). As an initial matter, the district court agreed with Maryville that Hultz's expert testimony was inadmissible in its entirety, and thus could not be considered in deciding Maryville's summary judgment motion. The district court reached this conclusion because it believed that (1) at various points in her declaration and expert report, Hultz improperly "question[ed] the credibility of other witnesses," and (2) although Hultz "couched" her opinions "in terms of whether [Babb] performed properly in the two surgical cases," Hultz was "really," and improperly, "telling the jury what result to reach" with respect to pretext. *Id*. at 770–71.[5] With Hultz's testimony excluded, the district court then found that, although a reasonable juror could conclude that Maryville regarded Babb as disabled (due to her impaired vision), *id*. at 775–76, Maryville was nonetheless entitled to summary judgment because there was "no evidence that [Maryville] did not honestly believe" that Babb's "clinical errors" rendered her unfit to practice nurse anesthesiology, or "that the real reason for [Maryville's] decision was discrimination [on the basis of Babb's perceived visual disability]." *Id.* at 778.

Babb timely appealed.

## II. DISCUSSION

This appeal requires us to resolve three disputes. First, whether the district court abused its discretion in excluding Jennifer Hultz's expert testimony in its entirety. Second, whether the district court correctly determined that a genuine dispute of material fact existed with respect to Maryville's perception of Babb's "disability." And, third, whether the district court correctly

---

[5]The district court did not address Maryville's contention that the facts surrounding Babb's clinical errors were too "simple" to warrant expert testimony.

determined that a genuine dispute of material fact did *not* exist with respect to whether Maryville acted "pretextually."  We address each issue in turn.

**A.  Expert Testimony**

We review a district court's exclusion of expert testimony for abuse of discretion.  Thus, we generally defer to the district court's judgment, and will reverse the district court "only if we are firmly convinced that the district court erred," such as by basing its ruling on an erroneous interpretation of the law.  *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258 (6th Cir. 2001).

Federal Rule of Evidence 702 permits "qualified" persons to testify as an "expert" in support of a party, and to offer "reliable" "opinions" on relevant matters within their expertise.  Fed. R. Evid. 702.   In determining whether proffered expert testimony meets this standard, district courts generally make three inquires: (1) is the witness "*qualified* by 'knowledge, skill, experience, training, or education'"?; (2) is the testimony "*relevant*," "meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue'"?; and (3) is the testimony "*reliable*" under the factors outlined in Fed. R. Evid. 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)?   *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (emphasis added) (quoting Fed. R. Evid. 702).  "[R]ejection of expert testimony is the exception, rather than the rule."   *Id*. at 530 (quoting Fed. R. Evid. 702 advisory committee's note, 2000 amend.).

Here, the only question is whether Hultz's testimony was relevant.   In holding that Hultz's testimony was not relevant, and therefore inadmissible, the district court relied on two legal principles.  First, the principle that expert witnesses "may not testify about the credibility of other witnesses" because "[i]t is the province of the jury to assess the credibility of witnesses." *Babb*, 361 F. Supp. 3d at 770; *accord Smith v. Jones*, 721 F. App'x 419, 423 (6th Cir. 2018); *Esch v. County of Kent*, 699 F. App'x 509, 517 (6th Cir. 2017); *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999).  And, second, the principle that expert witnesses may not tell the jury "what result to reach" on "ultimate legal question[s]" because such statements also "invade the province of the jury."   *Babb*, 361 F. Supp. 3d at 771; *accord United States v.*

*Volkman*, 797 F.3d 377, 388 (6th Cir. 2015); *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994); *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985).

After carefully reviewing Hultz's report and accompanying declaration, we are firmly convinced that the district court erred when it excluded Hultz's proffered testimony *in its entirety*, based solely on these two legal principles. Put more simply, we conclude that the district court used a sledgehammer, when the law required that it use only a scalpel.

With respect to the first principle—credibility—the district court correctly identified some statements in Hultz's proposed testimony that appear to be nothing more than attacks on Price's and Dr. Luhn's memory and, by extension, their credibility. *See, e.g.*, R.24-8 (Hultz Dec. ¶¶ 8, 21) (Page ID #661, 664). But this reasoning could not have served as the basis to exclude Hultz's entire testimony because, on several occasions, Hultz assumed the truth of Price and Dr. Luhn's factual testimony, but then nonetheless explained why Babb's actions could still not be considered "clinical errors" under the relevant standard of care. *See, e.g.*, *id.* ¶¶ 12, 23–25 (Page ID #662, 664–65); *see also* R.24-8 (Hultz Expert Rep. at 4–6) (Page ID #669–71). This latter testimony is both relevant to the question of pretext and free of improper credibility attacks.[6] And yet the district court did not explain why this, too, should be excluded. That was error.

The district court also erred with respect to the second principle—ultimate legal conclusions. In its decision, the district court appeared to treat Hultz's key opinion, *i.e.*, that Babb's behavior during the two critical incidents accorded with the relevant "standard of care," as an improper legal conclusion on the question of *pretext*. *See Babb*, 361 F. Supp. 3d at 771 ("While these opinions are couched in terms of whether plaintiff performed properly in the two surgical cases, the statements are really telling the jury what result to reach. By opining whether defendant's stated reason for termination was pretextual or not, these statements invade the province of the jury by stating the ultimate legal question."). But this reasoning overstates both Hultz's proposed testimony and the scope of our "ultimate legal conclusion" case law. As we

---

[6]Of course, Maryville's standard of care for its nurses may be higher than the general standard of care set by state tort law. As an employer, Maryville gets to set its own standard for employees to follow. Nevertheless, Hultz's testimony is relevant because it has a tendency to show that Babb's actions did not amount to "clinical errors" under either Maryville's standard or the general standard of care applicable to all nurses. *See* Fed. R. Evid. 401.

have explained before, there is a "subtle," but "nonetheless important" distinction between "opin[ing] on the ultimate question of liability" (impermissible), and "stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue" (permissible). *Berry*, 25 F.3d at 1353; *see also* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). In other words, although "[w]e would not allow a fingerprint expert in a criminal case to opine that a defendant was guilty (a legal conclusion)," "we would allow him to opine that the defendant's fingerprint was the only one on the murder weapon (a fact)." *Berry*, 25 F.3d at 1353. Thus, we have generally excluded expert testimony for stating a "legal conclusion" *only* when the witness explicitly testifies, in "specialized" legal terminology, that a defendant violated (or did not violate) the law. *See, e.g.*, *Killion v. KeHE Distrib., LLC*, 761 F.3d 574, 593 (6th Cir. 2014) (affirming the exclusion of expert report that "plainly attempt[ed] to define legal terms"); *Berry*, 25 F.3d at 1353 (holding that expert improperly stated a legal conclusion when he testified that a police department's "failure to direct and discipline and train their officers not to use improper deadly force constitut[ed] a pattern of gross negligence [and/or] deliberate indifference"); *Torres*, 758 F.2d at 149, 151 (holding that expert improperly stated a legal conclusion when he answered "yes' to the question "it is true, [doctor], that you did not believe that [plaintiff] had been discriminated against because of her national origin in that interview process?").

Here, Hultz neither "opines on the ultimate question of liability," *Berry*, 25 F.3d at 1353, nor frames her opinion in the "specialized" language of disability discrimination law, *Torres*, 758 F.2d at 151; indeed, Hultz does not even use the words "pretext" or "discrimination" in her report.**[7]** Rather, Hultz's "standard of care" opinion merely calls into question the *factual* assertion at the heart of Maryville's defense, namely, that Babb committed "critical" errors and displayed "terrible clinical judgment" during the fracture-table incident and the robotic-arm incident. R.24-2 (Robertson Dep. at 60–61) (Page ID #446–47). Thus, although Hultz's

---

**[7]**Admittedly, at one point in her report, Hultz states that Babb's clinical errors were not "legitimately" a basis upon which to base Babb's termination. R.24-8 (Hultz Expert Rep. at 6) (Page ID #671). And "legitimate" is, of course, a word that carries some legal weight in the employment discrimination context. *See infra* at 15. However, the question of whether Hultz crosses the line from factual testimony to legal testimony in any individual sentence is a context-specific endeavor we need not concern ourselves with today.

"standard of care" testimony could perhaps lead a reasonable juror to *infer* that Maryville's invocation of "clinical errors" was nothing more than a pretext for disability discrimination, *see infra* at 18–19, that possibility does not render Hultz's testimony inadmissible *in toto*.

Accordingly, because the district court offered only two reasons to exclude Hultz's testimony in its entirety, and because we find that neither reason justifies such a sweeping result, we reverse the district court's evidentiary decision. In deciding the merits of Babb's ADA claim, then, we will consider Hultz's testimony (or, at least, the admissible portions of Hultz's testimony), just as we consider the rest of the record.

## B. ADA Claim

As for the district court's grant of summary judgment, we review that decision *de novo*. *Ferrari*, 826 F.3d at 891. Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in deciding whether summary judgment is appropriate, we refrain from "weigh[ing] the evidence and determin[ing] the truth of the matter," and instead simply ask, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 251–52 (1986).

Title I of the Americans with Disabilities Act ("ADA") prohibits "covered" employers from "discharging" an employee because the employee is disabled, because the employee has a record of being disabled, *or* because the employer "regards" the employee as disabled. 42 U.S.C. §§ 12102(1), 12112(a). This litigation concerns only the "regarded as" prong of disability discrimination. Because there appears to be some confusion in our circuit as to what a plaintiff must do to establish a "regarded as" ADA claim under the current statute, we pause to emphasize the correct legal standard for reviewing such a claim.

Prior to 2008, and per Supreme Court precedent, we held that an employer "regarded" an employee as disabled if "(1) [the employer] mistakenly believe[d] that [the employee] ha[d] a physical impairment that substantially limit[ed] one or more major life activities, or (2) [the employer] mistakenly believe[d] that an actual, nonlimiting impairment substantially

limit[ed] one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999); *accord Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 704 (6th Cir. 2008). However, in 2008, Congress amended the ADA to overturn *Sutton*, and to eliminate the requirement that a "regarded as" plaintiff show that their employer "mistakenly believed" that their impairment "substantially limited one or more major life activities." Congress took this action because it believed that *Sutton* (among other Supreme Court decisions) unduly "narrowed the broad scope of protection intended to be afforded by the ADA," and thereby "eliminat[ed] protection for many individuals whom Congress intended to protect." Americans with Disabilities Amendments Act, Pub. L. 110-325, § 2(a)(4), 122 Stat. 3553 (2008). Therefore, the "regarded as" provision of the ADA now provides that an employee makes out a "regarded as" claim:

> if the [employee] establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity.*

42 U.S.C. § 12102(3)(A) (emphasis added). But, the statute goes on, this provision "shall *not* apply to impairments that are *transitory and minor*." *Id.* § 12102(3)(B) (emphasis added). Federal regulations then clarify that this "transitory and minor" limitation is an affirmative defense that the employer bears the burden of proving, 29 C.F.R. § 1630.15(f), and that "physical impairment" is otherwise defined broadly, to include "any physiological disorder or condition . . . affecting one or more body systems," *id.* § 1630.2(h).

Accordingly, to state the threshold condition of a "regarded as" ADA claim, an employee need only show that their employer believed they had a "physical or mental impairment," as that term is defined in federal regulations. The employer may then rebut this showing by pointing to objective evidence "that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor." *Id.* § 1630.15(f). *Accord Mancini v. City of Providence*, 909 F.3d 32, 45–46 (1st Cir. 2018); *Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll.*, 795 F.3d 698, 706 (7th Cir. 2015).

We have recognized this amended standard before, albeit not in a published decision. *See Baum v. Metro Restoration Servs., Inc.*, 764 F. App'x 543, 547 (6th Cir. 2019); *Neely v. Benchmark Family Servs.*, 640 F. App'x 429, 435 (6th Cir. 2016); *Bailey v. Real Time Staffing*

*Servs.*, 543 F. App'x 520, 523 (6th Cir. 2013). Our sister circuits have done likewise, in published decisions. *See, e.g.*, *Mancini*, 909 F.3d at 45–46; *Alexander v. Washington Metro. Area Transit Auth.*, 826 F.3d 544, 547–48 (D.C. Cir. 2016); *Adair v. City of Muskogee*, 823 F.3d 1297, 1304–06 (10th Cir. 2016); *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 591–92 (5th Cir. 2016); *Silk*, 795 F.3d at 706. To the extent we have issued decisions in recent years holding to the contrary—and, regrettably, we have—that was error. *See Ferrari*, 826 F.3d at 893; *Johnson v. Univ. Hosps. Physician Servs.*, 617 F. App'x 487, 491 (6th Cir. 2015).

With that threshold question cleared up, we now move into more familiar territory for employment discrimination law. That is, even if an employee establishes that their employer "regarded" them as disabled under the aforementioned standard, the employee must still show that their employer discharged them (or took some other form of adverse employment action against them) *because of*, or "but-for," their actual or perceived physical or mental impairment. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc). An employee may prove this causal connection in one of two ways.

First, an employee may "put[] forward direct evidence that [the employer] had a discriminatory motive in carrying out its employment decision." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998); *see, e.g.*, *Baum*, 764 F. App'x at 547 (employer told employee with a heart condition that he was being fired because of his "health issues and doctor's appointments").

Second, if such direct evidence is not forthcoming, an employee may point to circumstantial evidence of discrimination under the well-trod *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This standard requires the employee first to establish a "*prima facie* case of discrimination." *Cf. Ferrari*, 826 F.3d at 891–92 (explaining, in the context of a straightforward disability discrimination claim, that this requires the plaintiff to show that "(1) he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment action, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other

applicants or the disabled individual was replaced").[8]   Once the employee meets that "not onerous" requirement, *id*. at 894 (quotation omitted), the employer must then offer a "legitimate explanation for its action," which is also rarely an onerous requirement, *id*. at 892 (quotation omitted).   After the employer does that, "the burden then shifts back to the [employee], who must introduce evidence showing that the [employer's] proffered explanation is pretextual." *Id*. (quotation omitted).   Generally speaking, an employee can show that an employer's explanation was pretextual in "three interrelated ways": "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id*. at 895 (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)).   "However, the [employee] may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008)).   And, of course, we must always keep in mind that, at summary judgment, the employee "need not *prove* that the [employer's] proffered rationale is pretextual, as that would be enough proof for summary judgment in favor of the [employee]." *Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011).   Rather, the employee "must prove only enough to create a *genuine issue* as to whether the rationale is pretextual." *Id*.

Again, here, Maryville argues that it is entitled to summary judgment on Babb's "regarded as" ADA claim for two independent reasons:  (1) because no genuine dispute of fact existed as to whether it "regarded" Babb as disabled, and (2) because no genuine dispute of fact existed as to whether its stated reasons for terminating Babb, *i.e.*, the two clinical errors, were a

---

[8]Admittedly, this five-part test does not map neatly onto a "regarded as" claim.  For instance, elements (1) and (4) are already captured in the threshold inquiry into whether the employee has adduced evidence showing that their employer believed they had a "physical or mental impairment."  And, although a "regarded as" plaintiff still must show that they are "qualified" for a position, *see, e.g.*, *Adair*, 823 F.3d at 1306–07, inquiries into "reasonable accommodations" are irrelevant, *see* 42 U.S.C. § 12201(h) (noting that an employer "need not provide a reasonable accommodation" to a "regarded as" plaintiff).  This context-specific understanding of prima facie evidence is not surprising, as the Supreme Court has long recognized that "the prima facie proof required from [a plaintiff] is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13.  However, because the parties do not dispute the elements of a prima facie case here, we need not definitively resolve that question today.

pretext to fire Babb on the basis of her perceived disability. The district court disagreed with Maryville on the first point, but agreed with Maryville on the second point, and so granted summary judgment in Maryville's favor. But, because we disagree with Maryville on both points, we reverse that grant of summary judgment. We explain why below.[9]

### 1. "Regarded As"

The first question is whether the district court correctly determined that a genuine dispute of material fact existed with respect to Babb's perceived disability. We conclude that it did, albeit while employing the incorrect legal standard. *Compare Babb*, 361 F. Supp. 3d at 772–75 (using the "substantially limits one or more major life activities" standard) *with supra* at 14–15 (explaining why that standard no longer constitutes good law). Viewed in the light most favorable to Babb, the record shows, not only that Maryville physician-owners and employees openly expressed concern about Babb's "degenerative retinal condition," including on Babb's job evaluation and during the meeting at which Maryville decided to fire Babb, but that Maryville's head of personnel (Dr. Robertson) met with Babb specifically to discuss Babb's vision, and, during that meeting, asked Babb if she had disability insurance. *See Babb*, 361 F. Supp. 3d at 775 (emphasizing this latter fact). More still, after that meeting, Dr. Robertson advised her colleagues that Babb's vision issues might require them to consult an attorney. This is more than enough evidence from which a reasonable juror could find that, in January 2016, Maryville genuinely believed Babb had a "physiological . . . condition" affecting one of her "body systems," namely, her vision. *See* 29 C.F.R. § 1630.2(h) (noting that the term "body system" includes "special sense organs"); *accord Baum*, 764 F. App'x at 547.

In arguing to the contrary, Maryville does not attempt to show that Babb's vision constituted a "minor and transitory" impairment. 29 C.F.R. § 1630.15(f). Rather, it cites a series of cases standing for the proposition that "referring an individual to a fitness for duty

---

[9]As a point of context, we observe that both parties have proceeded through this entire litigation as if the *McDonnell Douglas* circumstantial evidence inquiry was the only appropriate lens through which to view this case. We are not entirely convinced that that was correct; the January 13, 2016 Crystal Aycocke e-mail arguably provided *direct* evidence in support of Babb's discrimination claim, too. However, because neither the parties nor the district court addressed this issue, and because we generally avoid opining on issues not raised in the lower court, we, too, will analyze Babb's claim solely under the *McDonnell Douglas* framework at this time. *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 614–15 (6th Cir. 2014).

examination when the employer knows the employee has medical problems" is not a "per se 'regarded as' violation." *Pena v. City of Flushing*, 651 F. App'x 415, 420–21 (6th Cir. 2016); *see also Johnson v. Univ. Hosp. Physician Servs.*, 617 F. App'x 487, 489, 491 (6th Cir. 2015); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 808–12 (6th Cir. 1999). But this case is nothing like those cases. In each of those cases, the employee tried to premise "regarded as" liability *solely* on the employer's (allegedly discriminatory) request that the employee undergo a fitness for duty exam. *See, e.g.*, *Johnson*, 617 F. App'x at 491 ("Johnson's *sole* evidence that defendant perceived her as disabled is that it referred her to a fitness-for-duty examination.") (emphasis added). We rightly rejected those claims, even in light of the 2008 ADA amendments, because the ADA specifically permits employers to "require a medical examination" if the examination "is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); *see Pena*, 651 F. App'x at 421. But, in attempting to prove that Maryville perceived her as physically impaired here, Babb does not rely solely (or even primarily) on Dr. Robertson's and Dr. Proffitt's request that she undergo an eye examination. Indeed, unlike the plaintiffs in Maryville's cited cases, Babb affirmatively complied with Maryville's request, *see supra* at n.1, and has not attempted to use that request as a "sword" against Maryville during this litigation. *See Pena*, 651 F. App'x at 421 (explaining that fitness-for-duty examination claims needed to be limited because the ADA is "not a sword enabling employees . . . to refuse reasonable [medical examination] requests by their employers and then use that statutorily-grounded request to plead a 'regarded as' claim") (quotation omitted). Consequently, these cases do not change our bottom-line conclusion: a genuine dispute of fact exists as to whether Maryville "regarded" Babb as "disabled" when it fired her in January 2016.

### 2. Pretext

The parties do not dispute that Babb has otherwise made out a prima facie case of disability discrimination, or that Maryville has met its correspondent burden of pointing to legitimate, non-discriminatory reasons for Babb's termination. We therefore turn to pretext. More specifically, we ask whether the district correctly determined that no genuine dispute of fact existed as to *why* Maryville fired Babb. We think it did not. Two particular fact disputes undergird this conclusion.

First, there is a factual dispute as to the reasonableness of Maryville's decision to base Babb's termination on the two "clinical errors" discussed above. *See Risch*, 581 F.3d at 391 (observing that "evidence which challenges the reasonableness of the employer's decision" can "shed[] light on whether the employer's proffered reason for the employment action was its actual motivation"). On the one hand, Maryville argues that Babb's missteps during the "fracture table" incident and the "robotic arm" incident were "critical" mistakes that evinced "terrible clinical judgment," and therefore unquestionably justified Babb's termination. R.24-2 (Robertson Dep. at 60–61) (Page ID #446–47). On the other hand, Babb has submitted expert testimony suggesting that she acted reasonably during both incidents, and in accordance with local CRNA standards. *See supra* at 9–12 (discussing proffered testimony of Jennifer Hultz). This dispute matters because the less serious Babb's clinical mistakes, the more likely they were not the "real" motivation behind Babb's termination.

In response to this line of argument, Maryville invokes the "honest belief rule." Appellee's Br. at 30–33; *see also Babb*, 361 F. Supp. 3d at 777–78 (accepting this argument, albeit without considering Hultz's testimony). This rule provides that, "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713 (6th Cir. 2007)). But Maryville fails to acknowledge that, although "an employee's *bare assertion* that the employer's proffered reason *has no basis in fact* is insufficient to call an employer's honest belief into question, and fails to create a genuine dispute of fact," *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) (emphasis added) (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)), an employee can still overcome the "honest belief rule" by pointing to evidence that "the employer failed to make a *reasonably informed* and considered decision before taking its adverse employment action." *Smith*, 155 F.3d at 807–808 (emphasis added); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012) (deeming our approach the "modified honest belief rule"). And, here, Hultz's testimony does just that. That is, Hultz does not so much challenge the *facts* underlying Maryville's stated reasons for firing Babb as she does the likelihood that a *reasonable* anesthesiology practice would have *actually relied on those facts* to

fire an experienced nurse practitioner like Babb. This case is thus distinguishable from the "honest belief" cases cited by Maryville (which are themselves indicative of most of our "honest belief" case law), where the employee advanced a "bare assertion" that the *facts* the employer relied on in firing them were wrong or overstated. *See, e.g.*, *Tingle*, 692 F.3d at 530 (employee argued that she was "not guilty of the conduct that led to . . . her ultimate termination").

Second, even if we accepted Maryville's description of the magnitude of Babb's clinical errors as the gospel truth, we would still be faced with an even more glaring factual dispute: whether those clinical errors "actually motivated" Maryville to fire Babb on January 13, 2016. *Ferrari*, 826 F.3d at 895. Recall that Maryville has never tried to defend its termination of Babb on grounds that Babb's vision created a safety hazard, and has instead insisted that Babb's termination occurred *solely* because of clinical errors unrelated to her vision. But, yet, just hours after Maryville decided to fire Babb, Crystal Aycocke wrote an e-mail to her fellow CRNAs essentially stating that Maryville was firing Babb *because of her impaired vision*. *See supra* at 6. More striking still, far from being mindless office gossip, Aycocke admits that she composed this e-mail *at the direction of Dr. Proffitt*—one of the key players involved in Babb's termination— shortly after Dr. Proffitt informed her of Babb's termination. *Id.* And, of course, all of this occurred in a context in which Maryville's physicians felt concerned enough about Babb's vision to discuss it at the meeting at which they decided to fire Babb, and on the official evaluations they wrote about Babb. *See, e.g.*, *id.* at 4 ("I see her questionable ability to see reflect on how surgeons and the medical staff lack accepting her."). If this kind of "smoking gun" evidence cannot get an employment discrimination plaintiff past summary judgment on the question of pretext, it is hard to imagine what could.

Maryville makes two arguments in response, neither of which is convincing. First, Maryville argues that, because Aycocke and Dr. Robertson strenuously contended at their depositions that Aycocke based her e-mail on "rumor and innuendo," rather than on the word of Dr. Proffitt or any other Maryville physician-owner involved in Babb's termination, no reasonable juror could find that Aycocke's e-mail is the "smoking gun" it appears to be. R.24-2 (Robertson Dep. at 151) (Page ID #537). But, given the context outlined above, accepting that narrative would require us to view the facts in the light most favorable to Maryville, and to

assume that Aycocke is a credible witness, which, of course, we cannot do at this stage. *Baum*, 764 F. App'x at 547. Second, and relatedly, Maryville claims that, because Aycocke is not a "decision maker," her e-mail "commentary" is "irrelevant," and therefore must be ignored as a matter of law. Appellee's Br. at 34. But the only support Maryville offers in support of this proposition is our decision in *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544 (6th Cir. 2004). There, in discussing whether certain "age-based slurs" made by the plaintiff's supervisor could show that the plaintiff was discharged because of his age, we observed that, "statements by non-decision makers, or statements by decision makers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden of demonstrating animus." *Id*. at 550 (quoting *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)). Aycocke's e-mail, however, was not the kind of "stray discriminatory remark," offered by a "non-decisionmaker," disconnected to the decisional process, like the remarks at issue in *Rowan* or in *Bush*, 161 F.3d at 369 ("ageist" comments made by "certain [company] officials" not "connected with the decisions to demote or terminate [plaintiff]" did not show pretext to age discriminate). Rather, Aycocke's e-mail was a quasi-official communication, written at the behest of one of the key players in Babb's termination (Dr. Proffitt), almost immediately after Babb's termination, following an in-person conversation with Dr. Proffitt. It was not a speculative claim shared privately among colleagues; it does not read like gossip. Indeed, despite submitting a declaration in discovery, *see* R.19-2 (Page ID #191), Dr. Proffitt has never testified to the contrary. In light of this rather unique context, then, a jury should decide whether Aycocke based the content of her e-mail on "rumor and innuendo," as she and Dr. Robertson testified at their depositions, or whether she based it on the word of Dr. Proffitt, as the circumstantial evidence would seem to suggest. And, if a jury could find that Aycocke based her e-mail on the word of Dr. Proffitt, a jury could also find that Maryville acted pretextually when it fired Babb for "clinical errors."

\* \* \* \*

In sum, there are genuine factual disputes with respect to whether Maryville regarded Babb as disabled, and there are genuine factual disputes with respect to whether Maryville acted pretextually when it fired Babb for her "clinical errors."  Accordingly, this case must go before a jury.

### III.  CONCLUSION

For these reasons, we **REVERSE** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.