NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0079n.06

No. 19-6469

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Feb 08, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff-Appellant, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| v. | ) ) ) | |
| WEST MEADE PLACE, LLP, | ) ) | |
| Defendants-Appellees. | ) ) | |

BEFORE:    DAUGHTREY, DONALD, and READLER, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. This case turns on whether there was sufficient evidence to establish that an employer "regarded" an employee as having a physical or mental impairment under the Americans with Disabilities Act (ADA). Carma Kean has a documented history of an anxiety disorder. Approximately six months into working as a laundry assistant at West Meade Place, LLP (West Meade), an ongoing situation with her co-workers triggered "flare ups" of her disorder. As a result, Kean asked her employer for leave under the Family Medical Leave Act (FMLA), supported by a certification from her doctor attesting to Kean's "serious [mental] health condition." Theresa Jarvis, Director of Nursing at West Meade, informed Kean that she did not qualify for FMLA, based on the length of her employment. Jarvis also explained that, in any case, leave would be unpaid. Kean, unable to go without pay, asked to return to work immediately, but Jarvis would not let Kean come back without a note from her

doctor stating that she was medically fit to return. Two days later, Jarvis terminated Kean and noted in Kean's file that the termination was caused by her inability to perform her job duties.

The Equal Employment Opportunity Commission (EEOC) brought this case on behalf of Kean, alleging that West Meade violated the ADA when it terminated Kean. West Meade, however, claimed that Jarvis was unaware that Kean was disabled and that, in any event, Kean was fired for providing a falsified document certifying that she could return to work after initially seeking medical leave. The district court, relying primarily on Jarvis's testimony, granted summary judgment in favor of West Meade, concluding that no reasonable jury could find that Kean met any of the statutory definitions of "disability" under the ADA. The EEOC now appeals, arguing that the district court improperly weighed the evidence in West Meade's favor. Because there are genuine issues of material fact and because a reasonable jury could find that Jarvis regarded Kean as having an impairment, we conclude that the district court erred in granting summary judgment to West Meade.

## FACTUAL AND PROCEDURAL BACKGROUND

Carma Kean applied for the position of laundry assistant at West Meade Place, LLP—a rehabilitation and healthcare facility in Nashville, Tennessee—in January 2015. She was hired and began working on February 6, 2015. Her responsibilities were to sort, load, unload, and fold laundry, to clean the dryers at scheduled intervals, and to not leave the dryers unattended while they were on.[1]

---

[1] In her application for employment, Kean did not indicate that she needed any accommodations to perform these tasks. Three days into employment, West Meade asked Kean to complete a Report of Medical History that called for information to be "given on a voluntary basis" and to indicate whether that information related to the employee's ability to perform the work. In responding to the question regarding whether she had ever experienced "nervous, mental or psychological problems," Kean answered yes and wrote "anxiety" in the space next to the question. She also reported that she was currently taking "Clozapine." Kean did not report any other issues despite being asked if she had ever experienced depression, excessive worry, or "nervous trouble of any sort," and denied every being treated for a mental condition.

Kean had a history of suffering from anxiety disorder that manifested in periodic "flare-ups" when she experienced panic attacks. Kean's flare-ups caused a variety of symptoms, including a racing heart, breathlessness, breaking down and crying, or feeling somewhat "discombobulated"—symptoms that could affect her ability to work. Her anxiety also caused psoriasis, a skin disorder. To manage her anxiety, Kean regularly traveled to Anderson, Indiana, to visit her physician, Dr. Aisha Hashmat, who prescribed her clonazepam, or Klonopin, which is used to treat panic disorders.

Kean successfully worked at West Meade for approximately six or seven months without her anxiety disorder substantially affecting her work. In August or September, however, new hires began working with Kean in the laundry room at West Meade who allegedly mistreated her and refused to do some of their own assignments, causing her anxiety to increase. Kean reported that two of the women yelled at her but then gave her the silent treatment, insulted her, and cursed at her—resulting in what Kean considered a hostile work environment. Kean reported the behavior of at least one of her co-workers to her supervisor, who "could tell she was anxious." This situation triggered Kean's anxiety disorder , which began to interfere with her work. She occasionally needed to "call out of work" altogether or leave early because of panic attacks.

On November 17, 2015, as a result of the increased anxiety Kean was experiencing, Dr. Hashmat's office faxed West Meade a "certification of health care provider" intended to provide documentation for an intermittent leave request under the FMLA. The certification indicated that Kean suffered from a "serious [mental] health condition" that began in 2006, would be "ongoing for a lifetime," that she was treated with prescription drugs, and that she was not able to work during "flare-ups." The prognosis indicated that Kean would miss work due to her condition for one-to-three days per month, three or four times a year.

3

The next day, Kean asked West Meade's payroll director, Deborah Varden, about taking FMLA leave, in accordance with the documentation that Dr. Hashmat's office had faxed to West Meade. Varden called in Theresa Jarvis, the Director of Nursing, to assist in explaining leave policies to Kean. Although the details of this exchange are disputed, it is clear that Kean was told she did not qualify for FMLA because she had not been employed at West Meade for twelve full months. It is less clear whether Kean believed the requested leave would be paid and whether Kean asked for intermittent leave—as indicated in the doctor's documentation—or for twelve consecutive weeks.[2] Once Jarvis made it clear that paid leave was not possible, Kean indicated she could not forego pay and asked to return to work that day. Jarvis, however, would not let her resume working without returning to the doctor to get medical approval to come back.

There are three accounts of what occurred next. According to Kean's testimony and Dr. Hashmat's call logs, Kean left West Meade and called Dr. Hashmat's office to request a letter stating that she could return to work without restrictions. She also informed the office that West Meade told her if she did not have the letter by the next day, they would let her go "due to [Kean] being unable to do her job." The doctor's office called West Meade to ask what the letter needed to state for Kean to be able to return to work. The next day, Jarvis called Dr. Hashmat's office stating that Kean needed to be reassessed by the doctor for a letter to be accepted releasing Kean to return to work and that the letter must state that Kean was "able to perform job duties without medical restrictions and no emotional distress can happen." That same day, Jarvis called Kean to let her know that West Meade was terminating her from her position for being "unable to perform [her] job duties."

---

[2] The EEOC contends that Kean asked for intermittent leave, as described in the fax. West Meade, on the other hand, contends that Kean "insisted" that she could have 12-weeks of paid leave through FMLA, and provided a doctor's note to that effect. No such note has been produced, nor was Jarvis's account referenced elsewhere in the record.

Jarvis tells the story differently. According to her deposition, Kean showed her a doctor's note on a prescription pad that stated Kean had to be off work for 12 weeks. Jarvis told Kean she needed a doctor's release to return to work, and Kean brought one in the next day. Upon receiving the doctor's note from Kean, Jarvis called the doctor's office and spoke to Dr. Hashmat, who said that she had not released Kean to return to work, nor would she. Jarvis also said that in this conversation, Dr. Hashmat said that she operates a pain clinic and was treating Kean specifically for pain; she denied giving Kean that note. According to Jarvis, she then notified Kean she was being terminated, placed the note from Dr. Hashmat that she determined to be falsified into Kean's file, and completed termination paperwork. That paperwork consisted of a "Change of Status and Separation Form," a "Supervisory Action Notice," and a page of notes. These documents all stated that the reason for Kean's termination was that she was unable to perform her job duties. Jarvis alleged that she spoke to Harold Smith, Kean's supervisor, and James Wright, West Meade's senior administrator, about Kean's falsification of documents and termination, but Wright's letter to the EEOC did not mention the falsified document. Moreover, West Meade failed to produce the falsified document in discovery, and Jarvis "believe[d] [it] to be lost." Jarvis claimed that she did not put the real reason Jarvis was terminated—for falsifying documents—in her paperwork because she did not want to affect Kean's chance of receiving unemployment.

The termination paperwork completed by Jarvis gives yet a third account. Although the Supervisory Action Notice and letter contained more details—notably ones that conflict with Jarvis's deposition testimony—the Change of Status and Separation form simply states that the reason Kean was terminated was because she was "unable to perform job duties," with a note that Kean "attempted to use M.D. in Anderson, Indiana where her sister works." Kean said that her sister has never worked at Dr. Hashmat's office but, instead, worked in the medical records office

of Community Hospital in Anderson. The letter attached to the termination paperwork includes the most details. In it, Jarvis wrote that on November 19, she received a message to call Dr. Hashmat's nurse. During the call, the nurse asked what was needed and "stated that Dr. Hashmat would not provide the employee with a release because [Kean] had not been back in the office to see Dr. Hashmat since one-and-a-half weeks prior to this conversation." Jarvis then relayed this information to Kean. Kean later called Jarvis back to say that Dr. Hashmat's office would now be releasing her to return to work and asked Jarvis to call the doctor's office back to speak to a specific person. Jarvis wrote that this person "was actually [Kean's] sister who works in the medical records office." The document stated that when Jarvis finally spoke with Dr. Hashmat, Dr. Hashmat said she would not release the employee to come back to work because she had not been re-assessed. Notably, Jarvis's letter also indicated that she had "explained to the employee that providing false documentation of a doctor release was grounds for termination." The letter then recapped what happened with Kean's initial request for FMLA but that ultimately Kean "failed to return to the physician and be assessed and she failed to provide a release to work by the physician. The employee was terminated for cause."

The EEOC filed suit on Kean's behalf in the United States District Court of Middle Tennessee alleging that West Meade violated the ADA by terminating Kean on the basis of a disability and by denying Kean reasonable accommodations. West Meade moved for summary judgment, and the district court granted it on the ground that no reasonable jury could find that Kean had a disability as defined by the ADA. The EEOC now appeals, arguing that a reasonable jury could find specifically that West Meade "regarded [Kean] as having…an impairment," falling under the ADA's third definition of "disability."

**DISCUSSION**

We review a district court's summary judgment ruling *de novo* and must view all facts in the light most favorable to the non-moving party. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018) (internal citations omitted). Summary judgment is proper only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]n deciding whether summary judgment is appropriate, we refrain from 'weigh[ing] the evidence and determin[ing] the truth of the matter,' and instead simply ask whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 318 (6th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 251–52 (1986)).

Title I of the ADA prohibits employers from discriminating against an employee "on the basis of disability." 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.4(a)(1). The definition of "disability" in the ADA, as amended in 2008, includes three independent prongs: (A) "a physical or mental impairment that substantially limits one or more major life activities of such individual," (B) a record of being disabled, or (C) "because the employer 'regards' the employee as disabled." 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(2); *Babb*, 942 F.3d at 318. In 2008, Congress amended the ADA to clarify the "regarded as" prong of the disability discrimination statute, broadening the scope of protection originally intended by the ADA. Americans with Disabilities Amendments Act, Pub. L. 110-325, § 2(a)(4), 122 Stat. 3553 (2008); *see also Babb*, 942 F.3d at 318-19 (explaining the history and intention behind the amendment). The amendment makes clear that:

> [A]n individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or

mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*.[3]

42 U.S.C. § 12102(3)(A) (emphasis added). Despite this change, the Sixth Circuit has, at times, erroneously interpreted the "regarded as" language as requiring a limitation to a major life activity until *Babbs v. Maryville Anesthesiologists P.C.* emphasized the correct legal standard in 2019. 942 F.3d at 319. A claim under the "regarded as" prong requires no showing about the severity of the impairment. *See id.* (explaining that a claimant is not required to have an impairment in the first place to make a claim under the "regarded as" prong.)

"Accordingly, to state the threshold condition of a 'regarded as' ADA claim, an employee need only show that their employer believed they had a 'physical or mental impairment,' as that term is defined in federal regulations." *Id.* Once an employee establishes that the employer perceived him or her as having an impairment, the employee must demonstrate that the perceived impairment was a "a 'but-for' cause of the employer's adverse decision."[4] *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (*en banc*) (citing *Gross v. FBL Financial Services*, 557 U.S. 167, 176 (2009)).

Thus, the key question in this case is whether Jarvis regarded Kean as having an impairment. West Meade makes two arguments in an attempt to establish that Jarvis could not have met this threshold.

---

[3] An affirmative defense to an ADA "regarded as" claim is that the impairment was "transitory and minor." 42 U.S.C. § 12102(3)(B). The employer must raise this exception as an affirmative defense. 29 C.F.R. pt. 1630, App. There is no evidence in the record that West Meade affirmatively raised it, so we need not consider it at this time.

[4] An employee can establish this causation through evidence that the employer had a discriminatory motive in terminating the employee. *Babb*, 942 F.3d at 319 (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998); *Baum v. Metro Restoration Servs., Inc.*, 764 F. App'x 543, 547 (6th Cir. 2019)). Alternatively, if there is no direct evidence of discriminatory motive, an employee may rely on circumstantial evidence under the *McDonnell-Douglas* burden-shifting framework. *Babb*, 942 F.3d at 319. Here, however, it is unnecessary to proceed to the three-step analysis.

First, West Meade contends that a reasonable juror could not find that West Meade regarded Kean as having a disability because Kean's anxiety did not affect her ability to do her work. However, "[t]he amended version of the ADA no longer requires the plaintiff bringing a claim under subpart (C) to show that the impairment limited her life activity." *Milholland v. Sumner Cnty. Bd. of Educ.*, 569 F.3d 562, 566 (6th Cir. 2009). "[Kean] need plead and prove only that the defendants regarded her as having a physical or mental impairment, no matter the defendants' view of the magnitude of the effect of the perceived impairment on her life activities." *Mercado v. Puerto Rico*, 814 F.3d 581, 588 (1st Cir. 2016).

In support of its argument, West Meade points out that we have previously held that an employee's "claim that his employers regarded him as impaired is first hampered by his own admission that his sleep issues did not affect his ability to work." *Neely v. Benchmark Family Servs.*, 640 F. App'x 429, 436 (6th Cir. 2016). Kean did, at one point in her deposition, state that her impairment did not continuously limit her ability to do her job. She also testified, however, that although she was not *physically* limited in doing her job, her anxiety attacks were triggered by the intensely upsetting encounters she experienced with the people she worked with—often inducing panic attacks—and in those situations, she said, she was limited her from "getting [her] work done." And, despite continuing to do her job with her condition, she "was trying to get help when [her] anxiety acted up because of the situation" with her co-workers.

"[T]hat these attacks were episodic makes no difference under the ADA." *Hostettler*, 895 F.3d at 854. Additionally, in their interrogatory responses, the EEOC described Kean's symptoms as having "interfered with daily activities and causing significant distress . . . aggravat[ing] her anxiety and preventing her from working." At times, Kean would "need[ ] to go to a quiet place in order to calm down." Although Kean's deposition testimony is not perfectly clear, both the

district court and this court must construe it in the light most favorable to her. Even if West Meade were able to show Kean had no other limitations in other activities, these facts do not necessarily rebut the notion that West Meade could have "perceived" her "as having an impairment" and fired her because of that perceived limitation, particularly in light of the updated standard under the ADA. 42 U.S.C. § 12102(3)(A).

West Meade next argues that Jarvis could not have regarded Kean as disabled with the information she had available.[5] However, the cases it cites to support this argument are all distinguishable. Several rely on a pre-amendment analysis largely based on proving the impairment substantially limited an employee's major life activities, an analysis that is no longer applicable after *Babb*. Others involved situations in which the employees never reported their disabilities or any symptoms of those disabilities to their employers. *See, e.g., Tennial v. United Parcel Svc, Inc.*, 840 F.3d 292, 306-07 (6th Cir. 2016); *Burns v. City of Columbus, Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 844 (6th Cir. 1996) (explaining that if the plaintiff presented no evidence to contradict affidavits that the employer was unaware of a disability and if the disability was not diagnosed until after termination, a *prima facie* case of discrimination cannot be made). There are several pieces of evidence that demonstrate Jarvis's awareness of Kean's impairment, however, making these cases inapposite. First, there is direct evidence that Jarvis knew specifically that Kean had an anxiety condition: there is a recording of Kean telling Jarvis that she suffered from anxiety attacks, and the Supervisory Action Notice, filled out by Jarvis, stated that Kean reported that "she had a medical condition of anxiety that required restrictions be

---

[5] West Meade also raises Kean's failure to fully disclose her impairment in her application and medical history report. But this fact is irrelevant because there is no evidence that Jarvis relied on it at the time she decided to terminate Kean. Further, West Meade points to no precedent to indicate that employees may not develop impairments requiring accommodations after they start their job. Indeed, Kean contends that her anxiety did not affect her work until the hostility caused by her co-workers began in August or September.

made to her position" and thus was applying for FMLA. Second, Jarvis possessed a fax from Dr. Hashmat stating Kean was unable to work during flare-ups of a "serious [mental] health condition." In addition, a jury could interpret Jarvis's testimony that Dr. Hashmat would not provide a release for Kean to return to work as evidence that Jarvis knew of Kean's significant medical issue. Finally, Dr. Hashmat's call logs indicate that Jarvis called to say that Dr. Hashmat's release letter must include the language that "no emotional distress can happen."

To further support its argument, West Meade highlights that once Kean learned that the leave she requested would be unpaid, she expressed the desire to come back to full-time work. The district court also relied on this factor as evidence supporting Jarvis's testimony that she did not regard Kean as having an impairment. *Equal Emp't Opp'ty Comm'n v. W. Meade Place LLP*, No. 3:18-CV-00101 (M.D. Tenn. Oct. 22, 2019) (order granting summary judgment) ("Why would she ask me if she could come back to work if she needed reasonable accommodations or had a disability?"). That said, the nature of this evidence is nonetheless disputed. Viewed in the light most favorable to Kean, however, it could be seen by a jury to reflect that Kean withdrew her request due to her inability to forego pay from a full-time job.

Construing the evidence in a light most favorable to Kean, as we must at this time, the record indicates that Jarvis was not only aware that Kean had an impairment that intermittently affected her ability to perform her job, but also that it was related to stress. Although—as West Meade argues—Jarvis may not have considered an anxiety disorder to constitute a disability, a "regarded as" claim under the ADA requires only that there was a perceived impairment, not necessarily that the employer perceived the disability to limit a major life activity. *Mancini v. City of Providence by & through Lombardi*, 909 F.3d 32, 45 (1st Cir. 2018).

Additionally, as documented, Jarvis terminated Kean because Kean was "unable to do her job," with no evidence that she was inhibited from doing her job by anything but her anxiety disorder. "To be sure . . . [West Meade's] knowledge of [Kean's] medical issues—alone—is insufficient to carry the day," *Baum*, 764 F. App'x at 547, but this perspective supports the EEOC's argument not only that Jarvis was aware of Kean's impairment, but also that Jarvis believed it would inhibit Kean from fully performing her job duties. This contradiction in Jarvis's testimony creates a genuine issue of material fact.

Because a reasonable juror could find that West Meade understood Kean to have a mental impairment, the next question is one of causation: did West Meade terminate Kean's employment because of her perceived impairment?

The EEOC argues that a jury could find that West Meade fired Kean because Jarvis regarded her as having an impairment and that Jarvis's "falsification-of-documentation rationale" was entirely pretextual. As support for causation, the EEOC relies on documentation showing that Kean—equipped with a note from her doctor—asked for intermittent leave, that she told Jarvis that she suffered from anxiety, that Jarvis recognized—per Dr. Hashmat's notes—the basis for requesting intermittent leave, that Jarvis understood the condition to be severe enough that she required a doctor's note stating Kean could return to work, and that the next day, Kean was fired because she was "unable to perform [her] job duties." In other words, "but for" Kean's admission of having an anxiety disorder and requesting an accommodation, West Meade would not have terminated her.

West Meade asks us to rely instead on Jarvis's testimony that the termination was because Kean falsified a medical document. But, as previously noted, there is no documented or corroborating evidence of the falsified note, despite Jarvis's statement that she placed it in Kean's

file. In the Change of Status and Separation Form" that Jarvis completed when she terminated Kean, she wrote that the "[e]mployee attempted to use M.D. in Anderson Indiana where her sister worked." West Meade claims this is evidence that Kean provided a false note. According to Kean and the EEOC, however, Kean's sister never worked in Dr. Hashmat's office. And, although Jarvis's notes on the day of the termination state that she advised Kean that providing falsified documents was grounds for termination, the letter notes that the "employee failed to return to the physician and be assessed and she failed to provide a release to work by the physician." Dr. Hashmat's call log documents a call from Kean informing the doctor's office that Jarvis told her that if a letter from the doctor releasing her back to work was not received by the next day, she would be terminated. The doctor's logs further state that when the office called Jarvis on November 20, 2015, to report that Dr. Hashmat would write a letter that Kean could return to work without restrictions, Jarvis responded that "[Kean] needed to be seen first to get this clearance" and "couldn't understand how she had FMLA forms filled out and now she is 'ok' to work."

It is possible that Jarvis misunderstood why Kean was visiting a doctor in Anderson, Indiana and, knowing Kean's sister lived there, believed that Kean fabricated the note and conspired to coordinate the phone calls. However, based on Kean's deposition that she brought her sister into the conversation when discussing intermittent leave, a jury could just as well decide that Kean's sister became involved because of her experience with FMLA and ADA and her ability to explain Kean's needs with more clarity. But, at this juncture, it is not the court's role to evaluate these facts and "determine the truth of the matter." *Babb*, 942 F.3d at 318 (quoting *Anderson*, 477 U.S. at 249). We need determine only whether there is a sufficient dispute of fact to require that the evidence be presented to a jury—and here, there is such a dispute. *Id.*

In the district court's analysis of the "regarded as" claim, the court relies almost exclusively on Jarvis's testimony, corroborated by Jarvis's written report regarding the termination, and ignores Kean's testimony and the doctor's office logs. But, "accepting [Jarvis's] narrative would require us to view the facts in the light most favorable to [West Meade], and to assume that [Jarvis] is a credible witness, which, of course, we cannot do at this stage." *Babb*, 942 F.3d at 323 (citing *Baum*, 764 F. App'x at 547). Although there is some merit to West Meade's arguments, there are too many factual disputes for the case to be resolved on the basis of summary judgment. The conflicting testimony and evidence described above "creates a classic credibility dispute, and 'determining the credibility of witnesses is a task for the jury[.]'" *Baum*, 764 F. App'x at 547 (quoting *United States v. Beverly*, 369 F.3d 516, 532 (6th Cir. 2004)).

> [I]n determining who may invoke the protection of the ADA, we do not always look to the individual claiming discrimination; when that individual seeks to proceed under a "regarded as" theory, we must look to the state of mind of the employer against whom he makes a claim. Under the "regarded as" prong of the ADA, membership in the protected class becomes a question of intent. And . . . *"that question—i.e., the employer's motive—is one rarely susceptible to resolution at the summary judgment stage."*

*Ross*, 237 F.3d at 706 (emphasis added).

## CONCLUSION

Because there are genuine disputes regarding material facts in the record before us and because the district court failed to view the evidence in a light most favorable to Kean, we conclude that the award of summary judgment to West Meade was inappropriate. We therefore REVERSE the judgment of the district court and REMAND the case for further proceedings.