NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0046n.06

No. 23-3346

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jan 30, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| MARILYN CROSSLEY, | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| v. | ) | |
| KETTERING ADVENTIST HEALTHCARE and BELINDA ISAAC, | ) | |
| Defendants-Appellees. | ) | OPINION |

Before: MOORE, MURPHY, and MATHIS, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**

### I. OVERVIEW

Marilyn Crossley ("Crossley") has worked as a speech pathologist at Kettering Adventist Healthcare ("Kettering") since 2001. Crossley has Ehlers-Danlos syndrome ("EDS"), which impacts her joint support; a heart condition; and multiple myeloma (a form of cancer). In 2019, Kettering terminated Crossley's employment after an investigation showed that she was accessing charts for patients to whom she was not assigned, which Kettering stated was a violation both of its policies and of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").[1] 42 U.S.C.A. §§ 1320d-1, 1320d-2(d)(2). Crossley sued Kettering and her supervisor, Belinda Isaac ("Isaac") (collectively, "the Defendants"), claiming that she was discriminated against based

---

[1]HIPAA establishes national standards to prevent medical professionals from disclosing patient information to anyone other than the patient and the patient's designated representatives. *See* 45 C.F.R. § 164.502.

on her age and disability, in violation of both federal and Ohio state law, and that Kettering had failed to give her reasonable accommodations for her disability. Kettering and Isaac moved for summary judgment, which the district court granted on all claims. Crossley timely appealed.

## II. BACKGROUND

Crossley has worked as a speech pathologist since January 1976, and has been a full-time employee at Kettering since August 2001. R. 39 (Crossley Dep. at 14, 16–17) (Page ID #289). Crossley started out "seeing acute patients" at Kettering before becoming the "first speech pathologist staffed for neuro rehab" when Kettering created its neuro rehab center around 2010. *Id.* at 17–18 (Page ID #289–90). In her position, Crossley worked four nine-hour days, for a total of thirty-six hours a week. *Id.* at 17, 60 (Page ID #289, 300). Crossley did not work on Wednesdays, although when Kettering's clinic hours shifted to close an hour earlier on Friday, she added an extra hour to her Tuesday shift to continue working thirty-six hours per week. *Id.* at 60 (Page ID #300). Crossley has EDS, which impacts the "ligamental support of [her] joints," a heart condition, and multiple myeloma. *Id.* at 64–65 (Page ID #301).

Crossley specializes in treating patients with Bell's palsy and certain facial tumors. *Id.* at 36 (Page ID #294). She took the "facial patients" in her caseload, but the schedulers did not give her "brain injury and concussion patients . . . by decision of [Isaac]." *Id.* at 38 (Page ID #295). Isaac stated that Crossley "didn't complete the competencies" required to treat ALS, TBI, or concussion patients. R. 43 (Isaac Dep. at 175) (Page ID #438). There were five therapists in Crossley's department, and Kettering's schedulers would assign patients to them based on openings, with some therapists (including Crossley) receiving a specific subset of patients. R. 39 (Crossley Dep. at 40) (Page ID #295).

2

Kettering has several workplace policies and procedures dictating employee conduct and use of patient information. The IP-KH Using, Requesting, and Disclosing Minimum Necessary Information ("IP-KH Minimum Necessary Info.") policy mandates that employees access protected health information ("PHI") only to the minimal extent "necessary to accomplish an individual's job duties, functions, and/or responsibilities," and states that unauthorized access to this information may violate HIPAA. R. 55-3 (IP-KH Minimum Necessary Info. at 1) (Page ID #1072). Employees are permitted to use PHI for "treatment, payment, and healthcare operations," including training. R. 55-4 (IP-KH Use and Disclosure of PHI at 1) (Page ID #1075). Kettering's IP-KHN Information Security and Privacy Violation Sanctioning Guidelines dictate how to categorize certain HIPAA violations and how to make disciplinary decisions based on those categories. R. 41 (Douglas Dep. at 15) (Page ID #370). If an employee accessed charts for patients who are not theirs, Kettering leadership would investigate whether they had done so for a legitimate business reason. *Id.* Whether a cited business reason was legitimate is largely up to leadership and depends on factors like one's role with a patient. *Id.* at 16–17 (Page ID #370). Kettering also has a "progressive correction action" policy to help employees address their actions. R. 43 (Isaac Dep. at 63–64) (Page ID #410). It lays out five different steps to take in disciplining employees: (1) setting an action plan; (2) initial warning; (3) written warning; (4) final written warning; (5) termination. *Id.* at 65 (Page ID #410); R. 49-27 (HR-KHN Conduct & Discipline at 2) (Page ID #768).

Around Crossley's sixty-fifth birthday, in April 2017, she had a conversation with other Kettering staff, including her manager Isaac, R. 43 (Isaac Dep. at 17) (Page ID #398), in the break room. The group was discussing social security, and Crossley stated that she planned on working

until she was seventy years old. *Id.* at 91 (Page ID #417). Isaac said that she "hope[d] to retire by that age [seventy]." *Id.* at 91–92 (Page ID #417). Isaac also asked Crossley whether she wanted to retire to spend more time with her grandchildren. R. 39 (Crossley Dep. at 24) (Page ID #291).

Because of her disabilities, Crossley used the handicapped parking spaces in front of the Kettering building. *Id.* at 61 (Page ID #300). In the spring of 2017, Isaac and Crossley had a conversation about her use of the handicapped parking spaces in front of Kettering's building. Isaac told Crossley that "as an employee, [Crossley] had to park in the back employee lot," which did not have any handicapped parking spots and led into the second-floor staircase. *Id.* at 53 (Page ID #298); *see also* R. 43 (Isaac Dep. at 99–101) (Page ID #419). Crossley stated it was impossible for her to use this lot, because she could not climb the staircase, nor could she "walk around to the front" to use the elevator. R. 39 (Crossley Dep. at 54) (Page ID #299). Isaac told Crossley that she would report her to human resources if she continued to use the handicapped spots, although Crossley continued to do so without hearing anything further about the matter. *Id.* at 61 (Page ID #300). Crossley was not disciplined by Kettering for using the handicapped spaces, *id.* at 62 (Page ID #301), although Isaac did issue an initial warning in March 2017 that "was upheld," R. 43 (Isaac Dep. at 105) (Page ID #420).

From November 2018 to March 2019, Crossley was on a leave of absence from Kettering in order to get a stem cell transplant. R. 39 (Crossley Dep. at 65–66) (Page ID #301–02). Before taking this leave, she had started chemotherapy for her myeloma in August 2018. She continued to work up until November 2018 because it was a "less damaging" form of chemotherapy and her doctor had told her she did not need to be off work. *Id.* at 67–69 (Page ID #302). During this period, she did not request that Kettering make any accommodations, although Isaac wanted her

to "take off three months" while she was on chemotherapy. *Id.* at 70 (Page ID #303). Eventually, Crossley applied for a leave of absence in November 2018 in order to go through with the stem cell transplant. *Id.* at 72–73 (Page ID #303). She was approved for this leave of absence and did not "encounter any resistance or opposition from Kettering" in doing so. *Id.* at 73–74 (Page ID #303–04). Isaac suggested that Crossley help to "train new therapists" at some point before Crossley took this medical leave. *Id.* at 31–32 (Page ID #293).

Crossley had planned, some time before her transplant, to go on the "Buckeye Cruise for Cancer" with her family, which was scheduled for the week after her leave of absence ended. *Id.* at 75 (Page ID #304). She asked Isaac if it would be a problem for her to "take that week before [she] return[ed]," and Isaac agreed. *Id.* at 75–76 (Page ID #304). Soon after this conversation, though, Isaac notified Crossley that her CPR training was expiring, and that Crossley had to update it before she came back in order to comply with Kettering's policies. *Id.* at 76 (Page ID #304). Crossley agreed to come in "off the clock" before her cruise in order to renew her CPR training. *Id.* She stated that she took the written component on her computer, but that the CPR dummy would not "click" and was broken. *Id.* at 78–80 (Page ID #305). Susan Bledsoe, a social worker at Kettering, informed Crossley that if she could not "compress the dummy," she would need to get a doctor's note saying she was "unable to do that because of [her] joints." *Id.* at 80 (Page ID #305). Crossley got the note, but also requested to do the CPR training elsewhere. *Id.* Isaac rejected the request because the training had to be through Kettering, although Crossley claims that she "later heard of someone who did it elsewhere, and it was accepted." *Id.* at 80–81 (Page ID #305). At her deposition, Isaac stated that she is familiar with the employee who renewed her CPR certification through a separate facility, but "wasn't aware that you could" when Crossley

asked her about it. R. 43 (Isaac Dep. at 148–49) (Page ID #431). Isaac also stated in an email that she did not believe Crossley would be able to "complete compressions," given her EDS. *Id.* at 142–43 (Page ID #430). Crossley's "preference would be to be certified," but that after she "got the no" from Isaac, the only other thing she did was discuss it with some of her coworkers, which Isaac also told her not to do. R. 39 (Crossley Dep. at 91–92) (Page ID #308).

Prior to taking her November 2018 to March 2019 leave of absence, Crossley had begun to train Kettering's newest therapist, Spencer Ambach ("Ambach"), by having him observe her and teaching him "[h]ow to diagnose and treat facial patients." *Id.* at 42 (Page ID #296). After Crossley returned from her leave of absence, she noticed that she "wasn't getting any patients on [her] schedule." *Id.* at 44 (Page ID #296). She did not know if Ambach was getting the facial patients but stated that her "schedule had a lot of openings," which "affect[ed] productivity[] or mean[t] that [she] would have to go home for the day." *Id.* She had been told before taking her leave that her work hours would be the same as they were when she left, *id.* at 99 (Page ID #310), although Isaac had suggested "cutting back" Crossley's hours for her first few weeks back, which Crossley agreed to, *id.* at 105 (Page ID #311). Isaac stated that she had some concerns about Crossley coming back full-time, because Crossley had told her that she was keeping herself in isolation and her lack of immunity was "wiping her out." R. 43 (Isaac Dep. at 134) (Page ID #428); *see also* R. 49-10 (Isaac Feb. 6, 2019 Email) (Page ID #710) (discussing Crossley's return to the office and noting that Crossley "was still having some issues caused by the transplant wiping out her immunity").

During her first two weeks back at Kettering, Crossley did not receive enough patients to make "productive time," and because she was out of paid time off ("PTO") (which Kettering

6

therapists were supposed to use when this happened), she did not get paid. R. 39 (Crossley Dep. at 107) (Page ID #312). Part of the issue with Crossley's scheduling was that, because she received an exemption for CPR training, Kettering needed to have backup and coverage by someone with the CPR certification to be working at the same time as Crossley. *Id.* at 95 (Page ID #309). Sometime shortly after Crossley's first two weeks back, her "hours increased to a full-time schedule," and she began working an extra hour on Tuesday, during which two other therapists (who were CPR-certified) worked. *Id.* at 112 (Page ID #313). At one point, Isaac asked Crossley if she would add hours on Wednesday to make up the missing hour from Fridays, but Crossley declined, because she was used to having Wednesdays for "medical appointments, chemo, a break." *Id.* at 113–14 (Page ID #313–14). Isaac then offered to have Crossley start working part-time, given that Kettering either needed to have someone who was CPR certified in the clinic at the same time as Crossley or have her cut her hours. *Id.* at 115 (Page ID #314). Crossley "felt like [Isaac] wanted her to be part time instead of full time." *Id.* at 118 (Page ID #315).

Crossley's lack of patients became a problem for her in July 2019, and she emailed Isaac, Megan Douglas ("Douglas"), an HR leadership partner, and Deb McConnell ("McConnell"), her office manager, about not having enough patients on her schedule. *Id.* at 151–53 (Page ID #323). Crossley had access to Kettering's scheduler window in her computer, which permitted her to "access all the charts" to see patients' evaluations and which therapist the doctor had ordered. *Id.* at 161–62 (Page ID #325–26). When Crossley checked the other therapists' schedules, she saw that they had more patients than she did. *Id.* at 160 (Page ID #325). At her deposition, she stated that other than checking the window for scheduling and charting purposes, which she deemed "appropriate patient care," teaching would be the only other reason for clicking on a patient's name

that would not be a HIPAA violation. *Id.* at 167–68 (Page ID #327). Crossley stated that she accessed the window only for scheduling purposes. *Id.* at 173 (Page ID #328). On July 29, 2019, McConnell told Crossley that she could not look at the charts, which Crossley did not think was a correct interpretation of Kettering policies. *Id.* at 178 (Page ID #330). Isaac stated that Crossley had been "told on three separate occasions" prior to August 8, 2019 that accessing charts that were not for her own patients was a HIPAA violation, R. 43 (Isaac Dep. at 178–79) (Page ID #439), although Isaac was not aware of any written communications to Crossley notifying her that checking charts for these scheduling purposes violated HIPAA, *id.* at 181 (Page ID #439).

Crossley did not change her practices after McConnell spoke with her, believing that HIPAA permitted her to look at the patient charts for scheduling purposes. R. 39 (Crossley Dep. at 179, 181) (Page ID #330). Douglas reached out to Megan Sheldon ("Sheldon")[2] and Audra Barkley ("Barkley"), members of Kettering's corporate integrity department, about Isaac's concerns that Crossley was accessing patient charts that were not hers. R. 43 (Isaac Dep. at 183) (Page ID #440). The corporate integrity department ran the reports of Crossley's chart access, and Isaac determined which patients were assigned to Crossley and which reports belonged to other therapists' patients. *Id.* at 185 (Page ID #440). On August 12, Douglas emailed Isaac, Sheldon, and Barkley that Crossley had accessed forty-seven charts that "she did not have business dealings in," and that Douglas believed this was a "Category 3 violation."[3] *Id.* at 188–89 (Page ID #441). At this point, they had not yet had a conversation with Crossley. *Id.* at 190 (Page ID #442).

---

[2]During Crossley's employment, Sheldon's last name was "Brickner," which also appears in the record.

[3]A "Category 3" violation is considered a "[d]eliberate or purposeful violation [of policies] without harmful intent." R. 49-27 (IP-KHN Info. Sec. & Privacy Violation Sanctioning Guidelines at 2) (Page ID #765). Although Kettering has a progressive disciplinary plan in place, it may also skip steps depending on the nature of the offense. *Id.* (HR-KHN Conduct & Discipline at 3) (Page ID #769).

On August 15, Douglas and Isaac met with Crossley and went through some of the examples of Crossley accessing patients' charts. R. 41 (Douglas Dep. at 46–47) (Page ID #378). Douglas and Isaac noted that "quite a few" of Crossley's proffered reasons for her doing so were "not business reasons for being in the charts," like wanting to know why a patient was assigned to a different therapist or how patients were doing. *Id.* Crossley also told them that "she believed some of the access was recorded by a screen shot that would open on the screen when you opened Epic [the scheduling software]." R. 43 (Isaac Dep. at 191) (Page ID #442). Crossley also communicated during the meeting that "she thought what she was doing was permissible," and Isaac and Douglas informed her that it was not. *Id.* at 194 (Page ID #443). Isaac confirmed that training was a permissible reason to access records and that Crossley was not actively training anyone, but stated that if Ambach had requested input, Crossley was permitted to give it. *Id.* at 194–95 (Page ID #443). Isaac stated that after the August 15 meeting, at which they had found Crossley's proffered business reasons unsatisfactory, they believed Crossley had committed a terminable offense, but decided to give her the benefit of the doubt and see if she continued to check other patients' charts. *Id.* at 208 (Page ID #446); *see also* R. 41 (Douglas Dep. at 66–67) (Page ID #383). When they audited Crossley's records access a few days later, they found that she had accessed three of Ambach's patients' charts since the August 15 meeting. R. 43 (Isaac Dep. at 211) (Page ID #447).

Crossley stated that after the August 15 meeting, the only other time she accessed charts for patients that were not hers was when Ambach asked her for help with one of his patients, and she pulled up the chart "for teaching purposes," because she "couldn't help him if [she] didn't know a thing about the patient." R. 39 (Crossley Dep. at 182–83) (Page ID #331). Ambach denied

9

that he had worked or consulted with Crossley on those patients, R. 43 (Isaac Dep. at 211) (Page ID #447), and no one verified or checked this with Crossley, *id.* at 226 (Page ID #451). On August 20, Kettering fired Crossley. Isaac confirmed that Crossley's response to McConnell on July 29 indicated she did not think her accessing the charts was inappropriate, and that between then and the August 15 meeting, no one notified her in writing that her conduct was a serious offense and had to stop. *Id.* at 224–25 (Page ID #450). During the August 15 meeting, Crossley viewed Isaac as searching for information to use to fire her and stated that Douglas was "accusatory" and treating her like she had acted criminally. R. 39 (Crossley Dep. at 198) (Page ID #335). Douglas and Isaac cited her accessing Ambach's patients' charts, told her she had violated HIPAA after being warned, and informed her on August 20 that she was terminated. *Id.* at 210 (Page ID #338). Isaac stated the decision to fire Crossley was based on Crossley violating "[Kettering's] corporate integrity compliance code of conduct, [Kettering's] information security and privacy violation sanctioning guidelines, [Kettering's] conduct and discipline policy, and [Kettering's] standards of behavior policy." R. 43 (Isaac Dep. at 229–30) (Page ID #451–52).

Until she was fired, Crossley was regularly rated a "solid performer" on her evaluations. *Id.* at 41–56 (Page ID #404–08). When making the decision to fire Crossley, Isaac confirmed that they did not consider: whether "corrective actions" had been previously taken with regards to Crossley's accessing charts, "exceptional solid or low performance discussions," "previous performance evaluations," overall work history with Kettering, or whether Crossley was in an introductory or disciplinary period, but instead they based the termination on "the activity itself." *Id.* at 218–21 (Page ID #449). Two years after Crossley's termination, Kettering had not hired someone else to fill her position, although they were "actively looking." *Id.* at 227 (Page ID #451).

Crossley also received two text messages from Kettering in 2022, inquiring as to whether she had interest in rejoining Kettering. R. 61-1 (Crossley Aff. at 3) (Page ID #1183).

Crossley sued the Defendants after they terminated her, claiming they had discriminated against her on the basis of her age and her disability, in violation of federal and Ohio law. She brought a total of five claims: (1) disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213; (2) disability discrimination under the Ohio Revised Code § 4112.02 ("Ohio Rev. Code"); (3) failure to provide a reasonable accommodation under the ADA, 42 U.S.C. §§ 12101–12213; (4) age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623; and (5) age discrimination under Ohio Rev. Code § 4112.02. R. 1 (Compl. at ¶¶ 31–71) (Page ID #7–12). The Defendants filed a motion for summary judgment on all of Crossley's claims, R. 58 (Def. Mot. Summ. J. at 1) (Page ID #1091), which the district court granted. *Crossley v. Kettering Adventist Healthcare*, No. 3:20-cv-319, 2023 WL 2573428, at *10 (S.D. Ohio Mar. 20, 2023). Crossley timely appealed.

### III. ANALYSIS

We review de novo a district court's grant of summary judgment. *Piersen v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 535–36 (6th Cir. 2014). Affirming the district court's decision is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching our conclusion, "[o]ur ultimate question is 'whether reasonable jurors could find by a preponderance of the evidence that [Crossley, as the nonmoving party] is entitled to a verdict.'" *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 805–06 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). We view all the facts and draw inferences in the

light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. The Ohio Supreme Court has held that the ADA is similar to Ohio's discrimination law, such that it "can look to regulations and cases interpreting the federal Act for guidance in [its] interpretation of Ohio law." *Columbus Civ. Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206–07 (Ohio 1998); *see also Carnahan v. Morton Bldgs., Inc.*, 41 N.E.3d 239, 242–43 (Ohio Ct. App. 2015). Similarly, we have held that age-discrimination claims under Ohio law are analyzed under the same standards as federal ADEA claims. *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282−83 (6th Cir. 2012); *see also Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 345 (6th Cir. 2015) (per curiam).

On appeal, Crossley argues that the district court erred in summarily dismissing evidence that Kettering had invited her to reapply for her position; in applying the honest belief doctrine; and in finding that Crossley had not sufficiently established that the Defendants had acted pretextually. We address each of her claims below.

## A. Invitation to Reapply

The ADA dictates that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees." 42 U.S.C. § 12112(a). The ADEA dictates that "[i]t shall be unlawful for an employer" to "discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). When a plaintiff seeks to prove disability or age discrimination through indirect, rather than direct, evidence, we employ the *McDonnell Douglas* burden-shifting framework. *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)); *see Blizzard*, 698 F.3d at 283. First, a plaintiff must make out a prima facie case that she was discriminated against. In the ADA context, she can make out this prima facie case by

showing that "(1) [] she is disabled, (2) [] she is otherwise qualified for the position, with or without reasonable accommodation, (3) [] she suffered an adverse employment action, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019) (quoting *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891–92 (6th Cir. 2016)). In the ADEA context, she can make out this prima facie case "by showing: (1) she was at least 40 years old at the time of the alleged discrimination; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) she was replaced by a younger worker, or there are circumstances that support an inference of discrimination." *Moffat*, 624 F. App'x at 346.

Once the plaintiff makes out a prima facie case under either law, the burden shifts to the defendant to proffer a nondiscriminatory reason for their taking the adverse action. *Willard*, 952 F.3d at 810. Neither the plaintiff's nor the defendant's burden is particularly onerous at this point. *Id.*; *see also Babb*, 942 F.3d at 320. If the defendant articulates a nondiscriminatory reason, the burden returns to the plaintiff to show that the defendant's rationale is pretextual and "that [the plaintiff] can meet [her] burden of persuasion." *Willard*, 952 F.3d at 810; *see also Babb*, 942 F.3d at 320 (explaining that the employee must prove a genuine issue of fact as to whether the employer's proffered rationale is pretextual). Plaintiffs can establish pretext by demonstrating that the defendant's reason: "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003)).

We assume *arguendo*, as the district court did below, *Crossley*, 2023 WL 2573428, at *6, that Crossley has met her light burden of establishing a prima facie case of disability and age discrimination, *cf. Willard*, 952 F.3d at 808. The Defendants' proffered rationale for firing Crossley, that she "knowingly and intentionally violated multiple policies applicable to her employment," Appellee Br. at 38, is nondiscriminatory. Our analysis focuses on whether Crossley has sufficiently shown that this cited reason for her termination is pretextual.

Crossley argued in her opposition to summary judgment and argues on appeal that Kettering's texts inviting her to reapply (nearly three years after her termination) show pretext because if Crossley's actions were as egregious as Kettering alleged, seeking to reemploy her would not make sense. R. 61 (Pl.'s Mem. Contra Defs.' Mot. for Summ. J. at 30) (Page ID #1178); Appellant Br. at 17–19. The district court found that Crossley had forfeited the argument by failing sufficiently to explain how the text messages evinced discriminatory animus. *Crossley*, 2023 WL 2573428, at *8 n.3 (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). A plaintiff forfeits an argument when they only "advert[] to [it] in a perfunctory manner, unaccompanied by some effort at developed argumentation." *McPherson*, 125 F.3d at 995–96. Crossley only briefly claims, without discussing any caselaw or other supporting authorities, that Kettering must have acted pretextually because it otherwise would not have sent the recruiting texts nearly three years after she was terminated. Appellant Br. at 18–19. Although this argument is not extensively developed, it is not quite so perfunctory that our precedent deems it forfeited. *Cf. Engler v. Arnold*, 862 F.3d 571, 577 (6th Cir. 2017) (upholding a district court's determination that a plaintiff had forfeited an argument when they made "only [a] conclusory statement").

Here, though, the text messages do not present a genuine dispute of material fact. Kettering's policies do not indicate, nor does Crossley appear to allege anywhere, that Crossley's disciplinary record, R. 50-10 (Crossley Disciplinary File) (Page ID #949), remained in her file after her termination. *See* R. 49-27 (HR-KHN Conduct & Discipline at 3) (Page ID #769) (stating only that "[disciplinary] forms remain in [an] employee's file during their entire tenure with the organization"). Without anything more to indicate that the individuals involved in sending Crossley the recruiting messages in 2022 knew the reason for her termination in 2019 and deemed it a non-issue, these messages cannot be used to demonstrate pretext.

Even if Crossley's disciplinary record were still in her file at the time Kettering sent the text messages, Crossley still does not sufficiently carry her burden of persuasion in arguing that the messages show pretext. She merely states that, given the fact that Kettering "terminated [her] and escorted her out of the building," Appellant Br. at 19, the recruiting texts must demonstrate that Kettering did not actually think that her "conduct warranted termination," *id.* We do not always require plaintiffs to provide "additional, independent evidence of discrimination," *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)), and at the summary-judgment stage, plaintiffs need only rebut, not disprove, a proffered reason. *Id.* Here, though, Crossley seems to allege that the texts cannot mean anything other than that Kettering's proffered rationale is pretextual, without sufficiently connecting them to any alleged discriminatory animus. In making her argument, she does not engage with the lack of a temporal proximity between the two events, *cf. Clay v. United States Parcel Serv., Inc.*, 501 F.3d 695, 718 (6th Cir. 2007), or the fact that Kettering had been struggling to fill her position since she was fired, R. 43 (Isaac Dep. at 227) (Page ID #451). Based on the

15

evidence at this point, which appears to merely be the existence of the texts themselves, a reasonable jury could not find in favor of Crossley's argument that the texts establish pretext.

## B. The Honest Belief Doctrine

Crossley also argues that the district court erred when it applied the honest belief doctrine in dismissing other independent bases she put forth to demonstrate pretext. Appellant Br. at 20–25. Under our honest belief doctrine, "for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, 'the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806–07 (6th Cir. 1998)). If a plaintiff seeks to prove pretext by challenging the motivation behind an investigation or termination, as Crossley does here, Appellant Br. at 20, they must "'admit[] the factual basis underlying the employer's proffered explanation and further admit[] that such conduct could motivate dismissal.'" *Blizzard*, 698 F.3d at 287 n.6 (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012)). The Defendants argue that because Crossley is challenging the factual basis of her termination, the district court did not err in applying the honest belief doctrine. Appellee Br. at 41–42.

Crossley cites our decision in *Babb* to support her claim that the honest belief doctrine should not apply to her case because she is actually challenging the Defendants' motivation behind terminating her. Appellant Br. at 20–21. In *Babb*, we declined to apply the honest belief doctrine in the case of an employee who had a degenerative eye condition and had been fired from her position as a Certified Registered Nurse Anesthetist for committing "clinical errors." 942 F.3d at 311. We distinguished between cases "where the employee advanced a 'bare assertion' that the

16

*facts* the employer relied on in firing them were wrong or overstated," *id.* at 323, and instances where the employee is challenging "the likelihood that a *reasonable* [employer] would have *actually relied on those facts* to fire an experienced [employee]," *id.* Challenges to the factual basis of a termination can be decided under the honest belief doctrine, whereas claims that an employer failed to make a reasonable decision in taking adverse action can overcome the rule. *Id.*

Crossley argues that her looking at the charts was not actually the reason that the Defendants fired her, Appellant Br. at 20, but she also maintains throughout that her looking at other therapists' charts did not violate HIPAA, *id.* at 22. In doing so, Crossley challenges the basis of her termination. For her case to be analogous to our decision in *Babb*, though, she would have to concede that her actions could have violated HIPAA—which Kettering has consistently cited as its reason for firing Crossley, *cf. Babb*, 942 F.3d at 323—and argue that even if they had, her conduct was not why the Defendants decided to terminate her, *id.*; *see also Blizzard*, 698 F.3d at 287 n.6. Crossley's case far more resembles our decision in *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530–31 (6th Cir. 2012), in which we applied the honest belief doctrine when an employee claimed that she was "not guilty of the conduct that led to . . . her ultimate termination," than it does *Babb*.

Further, in *Babb*, we held that the employee was able overcome the honest belief rule because she could point to "evidence that '[her] employer failed to make a *reasonably informed and considered decision before taking its adverse employment action.*'" 942 F.3d at 322–23 (quoting *Smith*, 155 F.3d at 807–08). On the same day of the employee's termination, Babb's employer had sent around an email explicitly stating that she had been fired because of the difficulties that her disability posed to her ability to perform her job. *Id.* at 323. The employee

also had expert testimony that the "clinical errors" her employer cited as the cause for termination were "in accordance with local [] standards." *Id.* at 322. Here, Crossley argues that her actions did not violate HIPAA and that the Defendants did not cite a specific hospital policy when she tried to dispute this to them, Appellant Br. at 21–22, and that the Defendants' investigation was a "sham," *id.* at 23–25. Neither of these arguments creates a genuine factual dispute about whether the Defendants had acted unreasonably in terminating her. *See Babb*, 942 F.3d at 322–23.

Even if we presume that Crossley is correct, and that her actions ultimately did not violate HIPAA, she does not advance any evidence that could cause a reasonable juror to believe that her looking at the charts was not the Defendants' motivation for her termination. Unlike the plaintiff in *Babb*, Crossley does not have a "smoking gun" email, *cf. Babb*, 942 F.3d at 323, nor is there anything in the record indicating that a reasonable employer would not view accessing other therapists' charts as a HIPAA violation. We have previously stated that it is not unreasonable for a hospital to rely on perceived violations of patient privacy in deciding to terminate an employee. *Cf. Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 399 (6th Cir. 2008) (rejecting a claim that a hospital had acted pretextually in firing employees for violating HIPAA, even when the hospital's policies were ambiguous, and noting that patient privacy "is of paramount concern to healthcare providers").

Crossley also does not provide adequate support for her argument that the honest belief doctrine could not be applied because the Defendants' decision to terminate her was based on a sham investigation. Appellant Br. at 25. She cites parts of both Isaac's and Douglas's testimony, in which each was discussing their treatment of the reports of Crossley's chart access and their August 15 meeting, but she does not explain how these exchanges support her claim that the

investigation was pretextual. *Id.*; *see also* R. 41 (Douglas Dep. at 58–65) (Page ID #381–82); R. 43 (Isaac Dep. at 182–97) (Page ID #440–43). Crossley also alleges that the court can infer pretext, because she was not involved in the investigation at all. Appellant Br. at 25. However, the record shows that she was questioned about her accessing the charts during the August 15 meeting and was given an opportunity to explain what her legitimate business reasons were for doing so, and that the Defendants gave her another chance before deciding to terminate her. R. 43 (Isaac Dep. at 208) (Page ID #446); *see also* R. 41 (Douglas Dep. at 66–67) (Page ID #383).

Because Crossley does not point to evidence that would create a genuine dispute of material fact over whether the Defendants' decision to terminate her was actually based on perceived HIPAA violations, our decision in *Babb* does not support her claim that the honest belief doctrine cannot be applied to her case. The district court did not err in applying the honest belief doctrine to Crossley's attempts to establish pretext, nor in concluding that the Defendants had an honest belief that Crossley had committed a terminable offense. Here, no one disputes that Crossley accessed charts that were not her patients' charts. Appellant Br. at 22. The Defendants relied on this access to find that Crossley had violated HIPAA and Kettering's policies. Even if Crossley's actions were ultimately permissible under HIPAA, the Defendants' decision appears "reasonably informed and considered," *Smith*, 155 F.3d at 807, and Crossley does not point to evidence indicating that they committed an error "too obvious to be unintentional," *id.* at 808.

## C. Inconsistent Reasons and Discriminatory Comments

Crossley also argues on appeal that she carried her burden to show that the Defendants' proffered reason for firing her was pretextual, based both on the Defendants' "conflicting and

inconsistent reasons" for firing her and on their making "discriminatory comments about [Crossley's] age." Appellant Br. at 25–30.

Inconsistent rationales can call a justification's credibility into question. *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). The record in this case, though, does not indicate that the Defendants shifted their rationale for terminating Crossley so much as to create a genuine dispute of material fact. The main crux of the Defendants' concern throughout the investigation was that Crossley had violated HIPAA by accessing charts for patients whom she was not treating. *See* R. 41 (Douglas Dep. at 67) (Page ID #383); R. 43 (Isaac Dep. at 228) (Page ID #451); R. 55 (Sheldon Dep. at 19–21) (Page ID #1058). The district court did not err in finding that the fact that various actors cited different privacy policies throughout Crossley's termination process was insufficient to establish pretext.

Next, Crossley claims that Isaac made discriminatory comments about her that betrayed Isaac's "discriminatory animus and tainted" the investigation into her actions. She cites Isaac's: (1) suggesting that Crossley retire; (2) expressing doubt that Crossley could do her job in light of her disabilities; (3) insisting that Crossley "take a leave of absence to treat her disability"; and (4) becoming "upset" upon learning "that [Crossley] was entitled to disabled parking." Appellant Br. at 27. In evaluating the probative value of alleged discriminatory comments, we look at "the declarant's position in the [employer's] hierarchy, the purpose and content of the statement, [] the temporal connection between the statement and the challenged employment action, [and] whether the statement buttresses other evidence of pretext." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998)).

Isaac was Crossley's supervisor and superior within Kettering's hierarchy. None of Isaac's statements, however, create a genuine dispute of fact with regard to discriminatory animus. As to the first instance, Crossley cites her conversation with Isaac in 2017, in which Isaac had stated that she hoped that she (Isaac) was retired by seventy after Crossley said that she (Crossley) intended to work until she was seventy. R. 43 (Isaac Dep. at 91–92) (Page ID #417). This conversation in the workplace breakroom occurred two years prior to Crossley's termination, and Crossley does not point to any other conversations that indicate that Isaac repeated these sentiments to her again. The content of the conversation, in this specific context, appears aimed at making (albeit misguided) conversation with a fellow co-worker, and does not indicate that Isaac's purpose in making these statements was to encourage Crossley to retire. Because of the lack of a temporal connection between this conversation and Crossley's termination, coupled with the conversation's content, purpose, and lack of additional buttressing statements, a reasonable jury could not find that it reflected a discriminatory animus based on Crossley's age.

Second, Crossley cites Isaac's concerns about Crossley's ability to do her job in light of her disabilities, and Isaac's encouraging Crossley to take a leave of absence to treat her disability. Appellant Br. at 27, 30. In context, Isaac's statements encouraging Crossley to take time off during her chemotherapy around August 2018 (about a year before Crossley was fired) and reflecting Isaac's hesitation about Crossley returning to work soon after undergoing the stem cell transplant in February 2019 also do not raise a genuine factual dispute regarding discriminatory animus. The content does not appear to be aimed at encouraging Crossley to retire permanently from her position with Kettering. Further, isolated statements expressing concern for an employee who is actively going through chemotherapy or experiencing suppressed immunity while working in a

healthcare setting do not reflect discriminatory animus on their own. Similarly, Isaac's concern about Crossley being able to perform her job without her CPR certification does not sufficiently demonstrate impermissible discriminatory animus against Crossley, given that even Crossley stated that it is good policy to have a CPR-certified therapist on site. R. 39 (Crossley Dep. at 115) (Page ID #314).

Finally, Crossley cites Isaac's reprimanding her about using the handicapped spot as evidence of discriminatory animus. Isaac states that she did not know Crossley had a handicap placard when approaching her about it; after the initial interaction, Isaac never brought it up again and Crossley continued to use the space. *Id.* at 61–62 (Page ID #300–01). Overall, given the context of these statements, the district court did not err in finding that they did not rise to the level of demonstrating discriminatory animus.

## D. Reasonable Accommodation

The Defendants also argue on appeal that Crossley does not make any argument regarding the sufficiency of Kettering's reasonable accommodations and has therefore forfeited the claim. Crossley's brief does not contain any challenge to the adequacy of the reasonable accommodations that Kettering provided, and we hold that Crossley has forfeited this argument. *See McPherson*, 125 F.3d at 995–96. Even if Crossley did not forfeit this argument, however, the accommodations Kettering offered to Crossley were sufficient under the ADA. Given Kettering's need to have a CPR-certified therapist on site, Isaac offered for Crossley to take some hours on Wednesdays, which Crossley did not want, or move to part-time hours, which Crossley agreed to. This satisfies the ADA's definition of "reasonable accommodations." *See* 42 U.S.C. § 12111(9)(B) (including

offering "part-time or modified work schedules" in the definition of "reasonable accommodations").

## IV.  CONCLUSION

We **AFFIRM** the district court's judgment.